## WAITE *v.* SANTA CRUZ.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 39. Argued April 24, 25, 1901.—Decided February 24, 1902.

On the facts, as stated in the opinion of the court, the city of Santa Cruz is estopped to dispute the truth of the recitals in the bonds in suit in this case, which stated that they were issued in pursuance of the act of California of 1893, as well as in conformity with the constitution of California, authorizing it to incur indebtedness or liability with the assent of two thirds of the qualified voters at an election held for that purpose, and that all acts, conditions and things required to be done precedent to issuing the bonds had been properly done and performed in due and lawful form as required by law.

The Circuit Court having correctly found that the parties who placed said bonds in the plaintiff's hands were *bona fide* purchasers, without notice

of anything affecting the truth of the recitals in them, the city cannot escape liability by reason of the fact, disclosed by its ordinances, that the eighty-nine first mortgage bonds of the Water Company assumed by the city, were included in its refunding scheme.

As to the question whether the person who signed said bonds was or was not, at the time of the signature, the rightful mayor of Santa Cruz, this court holds—(1) that the acts of a *de facto* officer are valid as to the public and third persons, although it is sometimes difficult to determine whether the evidence is such as to warrant a finding that a particular act or acts, the legality of which may be in issue, were those of a *de facto* officer: (2) That a *de facto* officer may be defined as one whose title is not good in law, but who is, in fact, in the unobstructed possession of an office, and discharging its duties in full view of the public, in such manner and under such circumstances as not to present the appearance of being an intruder or usurper: (3) That in such a case third persons, having occasion to deal with him in his capacity as such officer, are not required to investigate his title, but may safely deal with him upon the assumption that he is a rightful officer: (4) That if they see him publicly exercising such authority, and if they ascertain that it is generally acquiesced in, they are entitled to treat him as such officer, and, if they employ him as such, they ought not to be subjected to the danger of having his acts collaterally called in question.

As the plaintiff does not own the bonds or coupons in suit in this case, but holds them for collection only, the Circuit Court was without jurisdiction to render judgment upon such of the claims, in suit, whether bonds or coupons, owned by a single person, firm or corporation, and which, considered apart from the claims of other owners, could not have been separately sued on by the real owner by reason of the insufficiency of the amount of such claim or claims.

*Mr. John F. Dillon* for petitioner. *Mr. Harry Hubbard* and *Mr. John M. Dillon* were on his brief.

*Mr. James G. Maguire* and *Mr. F. R. Coudert, Jr.,* for respondent.

*Mr. Frank J. Sullivan* filed a brief as *Amicus Curiæ.*

MR. JUSTICE HARLAN delivered the opinion of the court.

This action was brought in the name of Waite, a citizen of Massachusetts, against the city of Santa Cruz, a municipal corporation of California of the fifth class, to recover the principal and interest of certain negotiable bonds, nine in number, and

certain negotiable coupons thereof, two hundred and eighty-two in number, issued April 16, 1894, in the name of the defendant city.

Each bond, signed by "Wm. T. Jeter, Mayor of the city of Santa Cruz," and attested by " O. J. Lincoln, City Clerk," contained these recitals:

" And for the payment of the principal sum [$1000] herein named, and the interest accruing thereon, the said city of Santa Cruz is held and firmly bound, and its faith and credit and all the real and personal property of said city are hereby pledged for the prompt payment of this bond and interest at maturity.

" This bond is one of a series of bonds of like date, tenor and effect, issued by the said city of Santa Cruz for the purpose of refunding the bonded indebtedness of said city and issuing bonds therefor, and providing for the payment of the same under and in pursuance of and in conformity with the provisions of an act of the legislature of the State of California, entitled ' An act to amend an act entitled " An act authorizing the common council, board of trustees, or other governing body of any incorporated city and town, other than cities of the first class, to refund its indebtedness, issue bonds therefor, and provide for the payment of the same" (approved March 15, 1883),' approved March 1, 1893.

" And in pursuance of and in conformity with the constitution of the State of California, and the ordinances of the city of Santa Cruz, and in pursuance of and in conformity with a vote of more than two-thirds of all the qualified electors of said city of Santa Cruz, voting at a special election duly and legally called and held and conducted in said city as provided under said act, on Tuesday, the thirteenth day of March, 1894, notice thereof having been duly and legally given and published in the manner as required by law, and after the result of said election had been canvassed, found and declared in the manner and as required by law.

" And it is hereby certified and declared that all acts, conditions and things required by law to be done precedent to and in the issue of said bonds, have been properly done, happened and performed, in legal and due form, as required by law.   This

.bond ceases to bear interest when due, unless presented for payment."

The parties having by written stipulation waived a jury, the case was determined in the Circuit Court upon a special finding of facts. The result was a judgment against the city for the full amount of the bonds and coupons held by the plaintiff, except as to three coupons transferred to him by the Northern Counties Investment Trust Company. 89 Fed. Rep. 619. That judgment was reversed in the Circuit Court of Appeals with directions to enter judgment for the city. 98 Fed. Rep. 387. The case is here upon writ of certiorari granted upon the application of the plaintiff Waite.

The propositions advanced on behalf of the city are numerous, but most of them are involved in the general contention that there was a want of power in the city to issue the bonds in question, and that nothing occurred that could estop it from disputing its liability even to those who may have purchased them in good faith and for value.

The circumstances under which the bonds were executed should be first set forth. That being done, we will take up such of the questions raised by the assignments of error as are necessary to be determined.

On the 16th day of September, 1889, the City of Santa Cruz entered into a contract with certain persons doing business under the name of Coffin & Stanton, which recited that the former desired to acquire, and the latter desired to furnish, a waterworks system for the city—the city agreeing to grant to Coffin & Stanton a franchise for the construction of waterworks in Santa Cruz and that firm agreeing to construct or cause to be constructed a waterworks system in conformity with specifications theretofore made by the city engineer. The city agreed to purchase the waterworks after they were constructed and pay for them the sum of $320,000. It was also stipulated that Coffin & Stanton should cause to be organized a corporation to be known as the City Water Company of Santa Cruz, to which the above franchise should be assigned. It was further provided that the Water Company should execute a first mortgage upon all its properties, rights, titles and franchises, then owned or thereafter

acquired, for the payment of bonds (not exceeding $400,000 in amount, except as provided in the contract) to be issued to Coffin & Stanton as the work of construction progressed, they to make all necessary cash advances. The contract provided: "And when said Water Company shall have fully completed said waterworks, then said Water Company shall convey absolutely to said city of Santa Cruz all its property, rights, titles and franchises, to have and to hold forever, subject only to the mortgage and to the deed of trust or escrow hereinbefore mentioned. . . . And said Water Company shall commence operations on the construction of said waterworks as soon as practicable, and shall have the whole completed within one year of such commencement."

Pursuant to the above agreement the city, by ordinance, granted to Coffin & Stanton a franchise and right of way to construct the waterworks, and such franchise and right were assigned by them to the City Water Company, incorporated September 27, 1889.

Under date of May 1, 1890, the Water Company, pursuant to that agreement, executed a mortgage or deed of trust to secure the payment of four hundred bonds of $1000 each. That was done in order to obtain money for the construction of the proposed waterworks.

Subsequently, March 29, 1892, the Water Company executed a deed to the city, which recited that the waterworks had been fully completed to the satisfaction of the city and had been accepted by it. By that deed the Water Company conveyed its entire property, rights, power, privileges and franchises to the city, to have and to hold the same, "subject, however, to said mortgage or deed of trust, and all the obligations thereby imposed, which bonds, mortgage or deed of trust, and obligations, the party of the second part [the city] *agrees to pay and perform.*"

When the act of March 1, 1893, referred to in the bonds was passed, as well as at the time the bonds were issued, the constitution of California provided that "no county, city, town, township, board of education or school district shall incur indebtedness or liability in any manner, or for any purpose, exceeding

in any year the income and revenue provided for it for such year, without the assent of two thirds of the qualified electors thereof, voting at an election to be held for that purpose, nor unless, before or at the time of incurring such indebtedness, provision shall be made for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for the payment of the principal thereof within twenty years from the time of contracting the same. Any indebtedness or liability incurred contrary to this provision shall be void." § 18, Article XI, Constitution 1879.

The ordinance referred to in the bonds—the one of 'the 26th day of February, 1894, (No. 314) calling a special election of the qualified electors of the city to determine the question of refunding " the bonded indebtedness of said city and issuing bonds therefor, and providing for the payment of the same "— stated that "the outstanding indebtedness evidenced by bonds of said city," which "it is proposed to refund," consisted of (1) 450 bonds, of $500 each, issued in 1889, the proceeds of which had been used " in the purchase and construction of the city waterworks;" (2) 89 first mortgage bonds of the Water Company, of date May 1, 1890, " which said bonds outstanding were, at the time of the conveyance by the City Water Company to the city of Santa Cruz of the property known as the city waterworks, and now are, a valid lien and charge upon the property known as the city waterworks, and become thereby a part of the bonded indebtedness of the city;" and (3) 65 municipal improvement bonds of $500 each, dated September 23, 1887, and 26 municipal improvement bonds of $250 each, of like date.

The ordinance provided for an issue of 360 bonds of $1000 each, payable to bearer, and carrying four per cent interest, payable annually, and which should be of the character known as " serials."

The same ordinance provided for a special election on the question of refunding the above bonds, and prescribed the form of the refunding bonds. That form contained the same recitals, word for word, that appear in the extract from the bonds found

at the beginning of this opinion. The ordinance thus concluded: "§ 12. If, upon the canvass of the returns of said election, it shall be found that two thirds of the voters thereat have voted in favor of refunding said indebtedness, issuing bonds therefor and providing for the payment of the same, then and thereafter said indebtedness shall be refunded, bonds issued therefor and provision made for the payment of the same in the manner herein and as by law provided."

On the same day the city council passed an ordinance, No. 315, which provided for notice of the special election so ordered, such notice to describe fully the indebtedness to be refunded. The required notice was given and contained the same description of the city indebtedness proposed to be refunded as was given in ordinance No. 314. The election was held on the day fixed by the ordinance and notice. The result was that 538 votes were cast in favor of and 57 votes against the proposed refunding of the city's indebtedness. So that more than two thirds of the qualified electors voting were in favor of refunding the then "bonded indebtedness of the said city," including the above 89 first mortgage bonds issued by the Water Company and which the city had assumed to pay when it purchased and took the deed for the waterworks.

On the 26th day of March, 1894, the city passed ordinance No. 320, which provided for refunding the indebtedness and issuing bonds therefor in accordance with the will of the voters at the special election.

That ordinance provided that each bond should contain the same recitals as those set forth in ordinance No. 314 and in the above notice of the special election, as well as this further recital: "And it is hereby certified and declared that all acts, conditions and things required by law to be done precedent to and in the issue of said bonds, have been properly done, happened and performed in legal and due form and as required by law."

By the same ordinance provision was made for giving notice by publication of the purpose of the mayor and common council to sell the bonds to the highest bidder, and inviting sealed bids from purchasers, and for levying and collecting an annual tax for forty years to pay such bonds and coupons—the moneys

so collected to constitute a sinking fund for the payment of the principal.

In the finding of facts it was also stated that on April 11, 1892, William T. Jeter was duly elected mayor of Santa Cruz, and J. Howard Bailey, J. F. Hoffman, E. G. Green and F. W. Lucas, on the same day, members of the common council of the city. The persons so elected as mayor and members of the common council qualified for their respective offices within ten days after election, and entered upon the duties of their respective offices. Section three of the act of the legislature of California, entitled "An act to reincorporate the city of Santa Cruz," approved March 11, 1876, provides that the mayor and common council of said city shall hold their offices for a term of two years, and until their successors are duly elected and qualified. On the ninth day of April, 1894, Robert Effey was duly elected mayor of defendant city to succeed William T. Jeter, and duly qualified as such between eleven o'clock A. M. and two o'clock P. M. of April 16, 1894; and Henry G. Ensell, John Howard Bailey, J. D. Maher and Frank K. Roberts were, on April 9, 1894, elected members of the common council of the city, all of them duly qualifying as such before the meeting of the council of the city held April 16, 1894. The persons so elected mayor and members of the common council on April 9, 1894, with the exception of Bailey, who was reëlected councilman, did not actually enter upon their duties as officers until May 7, 1894, and Jeter, Bailey, Hoffman, Green and Lucas continued to act publicly as mayor and members of the common council of the city until May 7, 1894, without protest from any person, and held seven meetings of the council between and including the date of April 16, 1894, and May 7, 1894.

All of the bonds and coupons sued on were in the form and bore date and were signed and attested as alleged in the complaint, but some of them were signed by William T. Jeter on April 16, 1894, after the qualification of his successor. Whether those sued on were among those signed by Jeter after the qualification of his successor does not appear.

On April 16, 1894, to which date the common council of the city had regularly adjourned, Jeter, acting as mayor, and Bailey,

Hoffman, Green and Lucas being present and acting as the common council of the city, and no bids having been received for the purchase of the refunding bonds issued by the city under ordinance 320, the proposition of Coffin & Stanton to take all the bonds, dated February 27, 1894, was accepted, upon the condition that they should furnish satisfactory security for the faithful performance of the agreement contained in that proposition.

Jeter as mayor, and Lucas, Bailey, Hoffman and Green, as members of the common council, publicly met on April 23, 1894, pursuant to adjournment of the common council, and, assuming to act as mayor and members of the common council of said defendant city, without protest or opposition from any one, accepted and approved a bond presented by Coffin & Stanton for the faithful performance of their proposed agreement, and directed the clerk of the defendant city to deliver to them the above refunding bonds, and all of them were in accordance with such direction delivered to Coffin & Stanton on April 24, 1894.

All of the nine bonds and coupons sued on matured April 15, 1895, and no part of them has been paid.

Coffin & Stanton never complied with the agreement upon which the bonds and coupons were delivered to them, and the defendant city never received any consideration on account of the issuing of the bonds, other than the promise of Coffin & Stanton to assume the payment of the bonds mentioned in their agreement.

It thus appears that the construction of the waterworks was brought about by the agreement between the city and Coffin & Stanton, under which the city was to purchase such works when they were completed;

That the waterworks were completed and were accepted by the city, and the city agreed to assume and pay the outstanding bonds issued by the Water Company in order to provide money with which to construct the waterworks, such bonds being secured (as was provided for by the agreement between the city and Coffin & Stanton) by a first mortgage upon the franchise and property of the Water Company;

That the city by ordinance proposed to refund its indebtedness under the act of 1893, describing in such ordinance 89 of the above first mortgage bonds of the Water Company which it had assumed to pay, and stating therein that those bonds were a valid lien and charge upon the property known as the city waterworks, and became thereby a part of the bonded indebtedness of the city;

That a special election was ordered to determine whether the qualified electors approved the proposed refunding;

That notice of such election was given, which described the bonds proposed to be refunded and which stated that the above 89 bonds had been assumed by the city as part of the purchase price of the waterworks, and were a valid lien upon such works;

That more than two thirds of the qualified voters approved the proposed refunding, including the above 89 first mortgage bonds;

That the city directed that any refunding bonds issued should state, upon their face, by way of recital, that they were issued under and in pursuance of the above act of 1893, and in conformity with the constitution of California, the ordinance of the city, and with a vote of more than two thirds of all the qualified voters of the city at a special election duly and legally called, held and conducted as provided by the act of 1893; and,

That the above bonds should upon their face further certify and declare that all acts, conditions and things required by law to be done precedent to and in the issue of the bonds had been properly done, happened and performed, in legal and due form, as required by law.

The Circuit Court of Appeals was of opinion that purchasers of the bonds were bound to take notice of the ordinances of the city, and that the entire issue of $360,000 in refunding bonds was invalid by reason of its including the $89,000 in bonds executed by the Water Company, the payment of which was assumed by the city. It reversed the judgment of the Circuit Court with directions to enter judgment for the city on the bonds.

1. The refunding act of March 1, 1893, p. 59, c. 47, amendatory of the act approved March 15, 1883, is as follows:

" § 1. That section one of the above-entitled act is hereby amended to read as follows: '§ 1. That whenever any incorporated city or town, other than cities of the first class in this State, has an *outstanding indebtedness, evidenced by bonds and warrants thereof,* the common council, board of trustees, or other governing body thereof, shall have power to submit to the qualified electors of such city or town, at an election to be held for that purpose, the question of refunding such indebtedness. Said election shall be called and held in the same manner in which other elections are held in such city or town. The notice of such election shall recite the indebtedness to be refunded, together with the denomination, character, time of payment, rate of interest, as well as all other details of the bonds proposed to be issued. Such bonds shall be of the character known as "serials," one fortieth of the principal being payable each year, together with interest due on all sums unpaid. Said bonds may be issued in denominations not to exceed one thousand dollars, nor less than one hundred dollars; principal and interest being payable in gold coin or lawful money of the United States, and either at the office of the treasurer of such city or town, or at a designated bank situated in the cities of San Francisco, New York, Boston or Chicago. Interest upon the same shall not exceed six per cent per annum, and may be payable semi-annually. Said bonds shall be sold in the manner provided by such city council, or governing body, to the highest bidder for not less than their face value, in the same character of money in which they were payable. The proceeds of such sale shall be placed in the treasury to the credit of the funding fund, and shall be applied only for the purpose of refunding the indebtedness for which they have been issued. Said common council, or other governing body, shall, at the time of fixing the general tax levy for each year, and in the same manner for such tax levy provided, levy and collect annually, each year, sufficient money to pay one fortieth part of the principal of such bonds, and also the annual interest upon the portion remaining unpaid.'

" § 2. That section two of said act be amended so as to read as follows: '§ 2. Whenever sufficient money is in the funding

fund, in the hands of the treasurer, to redeem one or more of the outstanding bonds proposed to be refunded, he shall publish once a week for two weeks in some newspaper of general circulation published in such city or town, if there be any, a notice to the effect that he is prepared to pay such bond or bonds, (giving the number thereof,) and if the same are not presented for redemption within thirty days after the first publication of such notice, the interest on such bonds will cease. He shall, at the same time, deposit in the post office a copy of such notice, enclosed in a sealed envelope, with the postage paid thereon, addressed to the owner or owners of such bond or bonds, at the post office address of such owner or owners, as shown by the record thereof kept in the treasurer's office. If such bond or bonds are not presented within the time specified in such notice, the interest thereon shall then cease, and the amount due be set aside for the payment of the same, whenever presented. All redemption of bonds shall be made according to the priority in the order of their issuance, beginning at the first number. Whenever such outstanding bonds are surrendered and paid, the treasurer shall proceed to cancel the same by endorsing on the face thereof the amount for which they are received, the word " cancelled " and the date of cancellation. He shall also keep a record of such bonds so redeemed, and shall make a report of the same to the common council, or other governing body of such city or town, at least once a month, accompanying the same therewith by the bonds which have been taken up and canceled.'

" § 3. That section three of said act be amended so as to read as follows : ' § 3. All moneys which shall remain in said funding fund after all outstanding bonds such as were proposed to be refunded have been taken up and canceled, shall be paid into the general fund of such city or town, and become a part thereof.'

" § 4. This act shall take effect and be in force immediately after its passage."

One of the contentions of the city is that the words " outstanding indebtedness, evidenced by bonds and warrants thereof," in this act do not embrace the 89 bonds executed by the Water Company. Those bonds, although not executed by the city,

certainly constituted a part of its outstanding indebtedness, for the reason that the city had assumed to pay them. Both the city authorities and the qualified electors so regarded the matter. The city's assumption of the bonds imposed as much obligation upon it to pay them as if it had itself directly executed and issued them. It could not acquire complete ownership of the waterworks without paying for them; and it took a deed for the waterworks expressly subject to a valid lien in favor of the Water Company's first mortgage bonds, including the above 89 bonds. In every substantial sense, therefore, these bonds were part of the city's outstanding bonded indebtedness. Such is the argument made in behalf of the plaintiff, and its force is recognized. But whether this view rests upon a sound construction of the act of 1893, we need not now say. That question is left open for determination when it must be decided, and our judgment is placed upon another ground, to be now stated.

2. The refunding bonds in suit, as we have seen, recited that they were issued under, in pursuance of, and in conformity with the act of 1893, the constitution of California, and the ordinances of the city of Santa Cruz, as well as in conformity with the vote of two thirds of all the qualified electors of the city, voting at a special election duly called, held and conducted, as provided by the above act; also, that *all* acts, conditions and things required by law to be done precedent to and in the issuing of the bonds, had been properly done and performed, in legal and due form, as required by law. As between the city and a *bona fide* purchaser of such bonds, can the city be heard to say that the bonds were not of the class embraced by the words in the act of 1893, " outstanding indebtedness, evidenced by the bonds and warrants thereof ? " Is the city estopped to dispute the truth of the recitals in its refunding bonds, there being nothing in such recitals indicating or suggesting that they were not true ?

The city contends that it is not thus estopped, because the ordinances, under which the special election was held, disclosed the fact that the 89 first mortgage bonds of the Water Company were included in the proposed refunding; that purchasers were bound to take notice of the provisions of such ordinances; and

that the ordinances, being examined, would have disclosed the fact that the bonds, although assumed by the city, were executed by the Water Company, and not by the city. Let us see whether a purchaser of the bonds was bound to know what those ordinances contained.

The first case to which we will refer is that of *Hackett* v. *Ottawa*, 99 U. S. 86, 95. The municipal bonds sued on in that case were issued by the city of Ottawa, Illinois. They contained recitals to the effect that they were issued by virtue of the charter of the city empowering it to borrow money, issue bonds therefor and pledge its credit for their payment, and in accordance with certain ordinances of which the titles and dates were given. The bonds stated upon their face that one of those ordinances, passed June 15, 1869, was entitled " An ordinance to provide for a loan for municipal purposes," and the other, " An ordinance to carry into effect the ordinance of June 15. 1869, entitled " An ordinance for a loan for municipal purposes." The principal defence was that the recital as to a loan for municipal purposes was untrue; that the bonds were not issued for municipal or corporate purposes, but as a simple donation to a private corporation whose business was in nowise connected with or under the control of the city, which facts, it was contended, appeared upon the faces of the ordinances themselves.

The constitution of Illinois provided that counties, townships, school districts, cities, towns and villages " may be vested with power to assess and collect taxes for corporate purposes." But this court did not deem it necessary to determine what were corporate purposes within the meaning of the Illinois constitution, saying : " A direct decision of that question does not seem to be essential to the disposition of this case. We content ourselves with stating the propositions which counsel have urged upon our consideration, and without expressing any settled opinion as to what are corporate purposes within the meaning of the Illinois constitution, we pass to another point, which, in our judgment, is fatal to the defence. It is consistent with the pleas filed by the city that the testator of plaintiffs in error purchased the bonds before maturity for a valua-

ble consideration, without any notice of want of authority in the city to issue them, and without any information as to the objects to which their proceeds were to be applied, beyond that furnished by the recited titles of the ordinances. For all corporate purposes, as we have seen, the council, if so instructed by a majority of voters attending at an election for that purpose, had undoubted authority, under the charter of the city, to borrow money upon its credit and to issue bonds therefor. The bonds in suit, by their recitals of the titles of the ordinances under which they were issued, in effect, assured the purchaser that they were to be used for municipal purposes, with the previous sanction, duly given, of a majority of the legal voters of the city. If he would have been bound, under some circumstances, to take notice, at his peril, of the provisions of the ordinances, he was relieved from any responsibility or duty in that regard by reason of the representation, upon the face of the bonds, that the ordinances under which they were issued were ordinances 'providing for a loan for municipal purposes.' Such a representation by the constituted authorities of the city, under its corporate seal, would naturally avert suspicion of bad faith upon their part, and induce the purchaser to omit an examination of the ordinances themselves. It was, substantially, a declaration by the city with the consent of a majority of its legal voters, that purchasers need not examine the ordinances, since their title indicated a loan for municipal purposes. The city is therefore estopped, by its own representations, to say, as against a *bona fide* holder of the bonds, that they were not issued or used for municipal or corporate purposes. It cannot now be heard, as against him, to dispute their validity. Had the bonds, upon their face, made no reference whatever to the charter of the city, or recited only those provisions which empowered the council to borrow money upon the credit of the city and to issue bonds therefor, the liability of the city to him could not be questioned. Much less can it be questioned, in view of the additional recital in the bonds, that they were issued in pursuance of an ordinance providing for a loan for municipal purposes; that is, for purposes authorized by its charter. *Supervisors* v. *Schenck,* 5 Wall. 772. It

would be the grossest injustice, and in conflict with all the past utterances of this court, to permit the city, having power under some circumstances to issue negotiable securities, to escape liability upon the ground of the falsity of its own representations, made through official agents and under its corporate seal, as to the purposes with which these bonds were issued. Whether such representations were made inadvertently, or with the intention, by the use of inaccurate titles of ordinances, to avert inquiry as to the real object in issuing the bonds, and thereby facilitate their negotiation in the money markets of the country, in either case, the city, both upon principle and authority, is cut off from any such defence." The same principles were announced in *Ottawa* v. *National Bank*, 105 U. S. 342, 343.

A case directly in point is that of *Evansville* v. *Dennett*, 161 U. S. 434, 443. That was an action on negotiable bonds payable to bearer and issued by the city of Evansville, Indiana, in payment of a subscription of stock in a railroad company. Each bond recited that it was issued in payment of such subscription, "made in pursuance of an act of the Legislature of the State of Indiana, and ordinances of the city council of said city, passed in pursuance thereof." There were other negotiable bonds involved in that suit, which were issued by the city, each reciting that it was issued by virtue of the city's charter, by virtue of a certain act of Assembly (its title and date being given), and by virtue of certain resolutions of the city council of named dates; and that the faith, credit, real estate, revenues and all resources of the city were irrevocably pledged for the payment of principal and interest. It was contended in that case that the ordinances of the city, if examined, would show that the election held in the city upon the question of issuing bonds was not legally held, and therefore that the bonds were issued without authority and were void. This court, upon a review of former decisions, said: "As, therefore, the recitals in the bonds import compliance with the city's charter, purchasers for value having no notice of the non-performance of the conditions precedent, were not bound to go behind the statute conferring the power to subscribe, and to

ascertain, by an examination of the ordinances and records of the city council, whether those conditions had, in fact, been performed. With such recitals before them they had the right to assume that the circumstances existed which authorized the city to exercise the authority given by the Legislature."

The only other case to which we need refer upon this point is *Gunnison County Commissioners* v. *Rollins*, 173 U. S. 255, 262, 274, 275. That was a suit upon negotiable coupons attached to negotiable bonds executed by the Board of Commissioners of Gunnison County, Colorado, and which recited that they were issued " in exchange at par for valid floating indebtedness of the county outstanding prior to September 2, 1882, under and by virtue of and in full conformity with the provisions of an act of the General Assembly of the State of Colorado entitled ' An act to enable the several counties of the State to fund their floating indebtedness,' approved February 21, 1881 ; that ' all the requirements of law have been fully complied with by the proper officers in the issuing of the bond ; ' that the total amount of the issue did 'not exceed the limit prescribed by the constitution of the State of Colorado ; ' and that such issue had been authorized by a vote of a majority of the duly qualified electors of the county, voting on the question at a general election held in the county on the 7th of November, 1882."

The question presented was whether such recitals estopped the county from asserting against a *bona fide* holder for value that the bonds created an indebtedness in excess of the limit prescribed by the constitution of Colorado. The principal defence was that the purchaser of the bonds was bound to take notice of the orders and records of the county commissioners authorizing the issue of the refunding bonds, and that an examination of those orders would have disclosed the fact that the bonds were in excess of the limit prescribed by the constitution of the State.

After a review of previous cases, namely, *Buchanan* v. *Litchfield*, 102 U. S. 278, 290, 292 ; *Orleans* v. *Pratt*, 99 U. S. 676 ; *Northern Bank of Toledo* v. *Porter Township*, 110 U. S. 608 ; 616, 619 ; *Dixon County* v. *Field*, 111 U. S. 83, 92–94 ; *Lake*

*County* v. *Graham*, 130 U. S. 674, 680, 683–684; *Chaffee County* v. *Potter*, 142 U. S. 355, 363, 364, 366, and *Sutliff* v. *Lake County Commissioners*, 147 U. S. 230, 235, 237–8, this court held that the *Gunnison* case was controlled by the decision in *Chaffee County* v. *Potter*, which was a suit on coupons of negotiable municipal bonds that contained the same recitals as were made in the Gunnison County bonds.   We said: " It was expressly decided in the *Chaffee County* case that the statute under which the bonds there in suit (the bonds here in suit being of the same class), authorized the county commissioners to determine whether the proposed issue of bonds would in fact exceed the limit prescribed by the constitution and the statute; and that the recital in the bond to the effect that such determination had been made, and that the constitutional limitation had not been exceeded, taken in connection with the fact that the bonds themselves did not show such recital to be untrue, estopped the county, under the law, from saying that the recital was not true. We decline to overrule *Chaffee County* v. *Potter*, and upon the authority of that case, and without reëxamination or enlarging upon the grounds upon which the decision therein proceeded, we adjudge that as against the plaintiff the county of Gunnison is estopped to question the recital in the bonds in question to the effect that they did not create a debt in excess of the constitutional limit, and were issued by virtue of and in conformity with the statute of 1881, and in full compliance with the requirements of law."    Again: " It is insisted with much earnestness that the principles we have announced render it impossible for a State, by a constitutional provision, to guard against excessive municipal indebtedness.   By no means.   If a state constitution, in fixing a limit for indebtedness of that character, should prescribe a definite rule or test for determining whether that limit has already been exceeded or is being exceeded by any particular issue of bonds, all who purchase such bonds would do so subject to that rule or test, whatever might be the hardship in the case of those who purchased them in the open market in good faith.    Indeed, it is entirely competent for a State to provide by statute that all obligations, in whatever form executed by a municipality under its existing laws, shall be subject to any

·defence that would be allowed in cases of non-negotiable instruments. But for reasons that every one understands, no such statutes have been passed. Municipal obligations executed under such a statute could not be readily disposed of to those who invest in such securities."

Applying to the present case the principles heretofore announced by this court, is there any escape from the conclusion that the city of Santa Cruz is estopped to dispute the truth of the recitals in the bonds in suit, which stated that they were issued in pursuance of the act of 1893 as well as in conformity with the constitution of California authorizing it to incur indebtedness or liability with the assent of two thirds of the qualified voters at an election held for that purpose, and that all acts, conditions and things required by law to be done precedent to issuing the bonds had been properly done and performed in due and lawful form as required by law? We think not.

The city of Santa Cruz had power, under the Constitution and laws of California, to refund its outstanding indebtedness, evidenced by bonds and warrants. The nature and extent of such indebtedness were matters peculiarly within the knowledge of its constituted authorities. When, therefore, the refunding bonds in suit were issued with the recitals therein contained, the city thereby represented that it issued them under and in pursuance of and in conformity with the act of 1893 and the constitution of the State. As nothing on the face of the bonds suggested that such representations were false, purchasers had the right to assume that they were true, especially in view of the broad recital that everything required by law to be done and performed before executing the bonds had been done and performed by the city. As there was power in the city to issue refunding bonds to be used in discharging its outstanding indebtedness of a specified kind, purchasers were entitled to rely upon the truth of the recitals in the bonds that they were of the class which the act of 1893 authorized to be refunded. They were under no duty to go further and examine the ordinances of the city to ascertain whether the recitals were false. On the contrary, purchasers could assume that the ordinances would disclose nothing in conflict with the recitals in the bonds.

The Circuit Court having found—and as we think correctly —that the "assignors" of the plaintiff, that is, the parties who placed the bonds in his hands, were *bona fide* purchasers, without notice of anything affecting the truth of the recitals in them, our conclusion is that the city cannot escape liability by reason of the fact, disclosed by its ordinances, that the 89 first mortgage bonds of the Water Company assumed by the city were included in its refunding scheme.

3. It is said, however, that the act of 1893 was repugnant to the constitution of California, in that it is a special law, relating to a subject concerning which that Constitution required all laws to be general. In *City of Los Angeles* v. *Teed*, 112 Cal. 319, 328, 329, the validity of the act of 1883 and that of 1893 amendatory thereof having been questioned by counsel, the Supreme Court of California said: "On March 15, 1883, an act was passed (Stat. 1883, p. 370) authorizing the governing body of every municipal corporation, other than cities of the first class, to fund or refund *any* indebtedness of the corporation by a vote of four fifths of their number. That act authorized the issue of bonds, to be exchanged for any existing indebtedness, or to be sold for money to be applied to the payment of such indebtedness. It is contended that this act violates the provision of the constitution against special legislation. But there can be no question that the act classifying municipal corporations is constitutional, *Pritchett* v. *Stanislaus County*, 73 Cal. 310, and that in matters pertaining to municipal organization the legislature may make different regulations for the different classes so created. *Pasadena* v. *Stimson*, 91 Cal. 249. The subject-matter of the act in question—the funding of municipal indebtedness—is ' peculiarly a matter pertaining to municipal organizations, and still more peculiarly a matter as to which cities of large population require different provision from that suitable to cities or towns of small population.' The act is, therefore, not obnoxious to that objection." Referring to the act of 1893, the court said: " It is contended that this act also is invalid, as special legislation; but what we have said as to the act of 1883 on this question applies equally to this act." Nothing further need be said upon this question.

4. Another defence is that Jeter, who signed the bonds, was not the rightful mayor of Santa Cruz. The facts bearing upon this point have been heretofore stated and need not be repeated. The Circuit Court said:

" It is claimed by the defendant that, as it is not shown that the bonds sued on were signed by Wm. T. Jeter before the qualification of his successor in the office of mayor, the plaintiff has failed to prove that the bonds were signed by an officer authorized to do so, and they must therefore be held void, even in the hands of *bona fide* purchasers, under the rule declared in *Coler* v. *Cleburne*, 131 U. S. 162. That case is not authority for the proposition that the action of a *de facto* officer in signing bonds would not be as binding upon the municipality for which he assumes to act as that of an officer *de jure ;* and it seems clear to me that if Jeter was the *de facto* mayor when he signed the bonds sued on, then such signature by him was a compliance with the ordinance requiring them to be signed by the mayor; and so, also, if he was *de facto* mayor, and those assuming to act as the common council of the defendant were *de facto* members of the common council at the time when he and they assumed as mayor and common council to accept the proposition of Coffin & Stanton in relation to the bonds, and directed their delivery to that firm, then such acts upon their part are to be treated, so far as concerns the public and third persons having an interest in what was done by them, as the acts of the *de jure* mayor and common council of the city. The rule that the acts of a *de facto* officer are valid as to the public and third persons, is firmly established, although it is sometimes difficult to determine whether the evidence is such as to warrant a finding that a particular act or acts, the legality of which may be in issue in a given case, were those of a *de facto* officer. The contention of the defendant is that Jeter was not the *de facto* mayor at the time of the signing and delivery of the bonds, nor were the old members of the common council, who continued to act as such after the qualification of their successors, and until after the bonds were delivered to Coffin & Stanton, *de facto* members of the common council of defendant, after the qualification of their successors. Whether one was or was

not a *de facto* officer at the time when he assumed to perform duties belonging to a public office, is a mixed question of law and of fact, *State ex rel. Van Arminge* v. *Taylor*, 108 N. C. 196; *S. C.*, 12 L. R. A. 202; *United States* v. *Alexander*, 46 Fed. Rep. 728. And in passing upon the question presented by defendant's contention upon this point, it is necessary to first consider what facts are sufficient to constitute a *de facto* officer. A *de facto* officer may be defined as one whose title is not good in law, but who is in fact in the unobstructed possession of an office and discharging its duties in full view of the public, in such manner and under such circumstances as not to present the appearance of being an intruder or usurper. When a person is found thus openly in the occupation of a public office, and discharging its duties, third persons having occasion to deal with him in his capacity as such officer are not required to investigate his title, but may safely act upon the assumption that he is a rightful officer. Thus it is said in *Petersilea* v. *Stone*, 119 Mass. 468 : " Third persons, from the nature of the case, cannot always investigate the right of one assuming to hold an important office, even so far as to see that he has color of title to it by virtue of some appointment or election. If they see him publicly exercising its authority, if they ascertain that this is generally acquiesced in, they are entitled to treat him as such officer, and, if they employ him as such, should not be subjected to the danger of having his acts collaterally called in question."

After referring to *Johns* v. *People*, 25 Mich. 503; *Attorney General* v. *Crocker*, 138 Mass. 214; *Hamlin* v. *Kassafer*, 15 Oregon, 456; *State* v. *Williams*, 5 Wis. 308, and *Magneau* v. *City of Freemont*, 30 Neb. 843, the Circuit Court said: " The foregoing cases sufficiently illustrate the principle upon which courts proceed in determining whether one who has assumed to act as a public officer was at the time an officer *de facto*, and it only remains to apply the rule which they establish to the facts which have been already stated as appearing in the present case, and in doing so there is but one conclusion that can be reached, and that is that Jeter was the *de facto* mayor of the city of Santa Cruz, and on the sixteenth day of April, 1894, at the time when he signed the bonds in question, and he and the persons who

assumed to act as members of its common council, on the six-
teenth and twenty-third of April, 1894, were on those days the
*de facto* mayor and the *de facto* members of the common coun-
cil of the defendant city."

We are entirely satisfied with the treatment of this question
by the Circuit Court, and deem it unnecessary to make any
additional observations.

5. All of the bonds and coupons sued on were duly transferred
to the plaintiff before the commencement of this action.   It is
agreed that he had at the bringing of this action the legal title
to all of them, although he paid no money consideration for the
transfer, and that the bonds and coupons were transferred to
him for collection only.

It is contended by the defendant that it does not appear that
the Circuit Court had jurisdiction, since the citizenship of the
persons who put the bonds in the plaintiff's hands for collection
is not set forth.

Prior to the passage of the Judiciary Act of August 13, 1888,
c. 866, 25 Stat. 433, it was the settled rule that the holder of a
negotiable instrument payable to bearer was not an "assignee"
thereof within the meaning of the Judiciary Act of 1789, c. 20,
or the act of March 3, 1875, c. 137, but was the holder in virtue
of an original and direct promise moving from the maker to the
bearer, and could sue without reference to the citizenship of
the original or any intermediate holder.   *Thompson* v. *Perrine*,
106 U. S. 589, 592–3.

The above act of 1888 did not change this rule, but it made
some alteration of former statutes.   Its first section excluded
from the cognizance of any Circuit or District Court of the
United States "any suit, except upon foreign bills of exchange,
to recover the contents of any promissory note or other chose
in action in favor of any assignee, or of any subsequent holder
if such instrument be payable to bearer and be not made by
any corporation, unless such suit might have been prosecuted in
such court to recover the said contents if no assignment or
transfer had been made."   25 Stat. 434.

The defendant, the city of Santa Cruz, is a corporation within
the meaning of that section.   *Loeb* v. *Columbia Township*, 179

U. S. 472, 485. So that, in respect of the bonds and coupons here in suit—they being payable to bearer. and having been made by a corporation—the complaint need not have disclosed the citizenship of any previous holder of the bonds. It shows —and nothing more was necessary so far as citizenship was concerned—a diversity of citizenship as between the holder of the legal title to the bonds and coupons and the defendant city.

But the act of 1888 did not repeal the fifth section of the act of March 3, 1875, c. 137, *Lehigh Mining & Mfg. Co.* v. *Kelly*, 160 U. S. 327, 339; *Lake Co. Comrs.* v. *Dudley*, 173 U. S. 243, 251, which provides " that if, in any suit, commenced in a Circuit Court or removed from a state court to a Circuit Court of the United States, it shall appear to the satisfaction of said Circuit Court, any time after such suit has been brought or removed thereto, that such suit does not really and substantially involve. a dispute or controversy within the jurisdiction of said Circuit Court, or that the parties to said suit have been improperly or collusively made or joined, either as plaintiffs or defendants, for the purpose of creating a case cognizable or removable under this act, the said Circuit Court shall proceed no further therein, but shall dismiss the suit or remand it to the court from which it was removed as justice may require, and shall make such order as to costs as shall be just." 18 Stat. 470, 472.

Does the present case come within this provision of the act of 1875 in respect of any cause of action embraced in it? It does not, if the only objection to the jurisdiction of the Circuit Court is that the plaintiff was invested with the legal title to the bonds and coupons simply for purposes of collection. But if the transfer was made for the purpose, in any way, of creating a case cognizable in the Circuit Court, of which it could not otherwise have taken cognizance, then the duty of this court is to take notice of that fact and give effect to the statute of 1875. *Metcalf* v. *Watertown*, 128 U. S. 586, 587, and authorities there cited. The jurisdiction of the Circuit Court, it must be observed, depends equally on the citizenship of the parties and the value of the matter in dispute. If the transferrers of the plaintiff were citizens of States other than California, as they seem to have been, each could have sued in the Circuit Court, if the

amount in dispute was sufficient; and therefore the transfers in such cases were not a fraud on the jurisdiction of the Circuit Court, *so far as the question of diverse citizenship was concerned.* But if the transfer enabled the plaintiff to embrace in his suit a claim or claims against the city of which the Circuit Court could not have entertained jurisdiction, at the suit of the transferrer, because of the insufficiency of the amount in dispute, then the act of 1875 would apply.

This question was presented and decided in *Bernards Township* v. *Stebbins,* 109 U. S. 341, 355, 356, which was an action on negotiable bonds brought in the Federal court sitting in New Jersey, the plaintiffs being citizens of New York and the defendant a municipal township of New Jersey. Referring to the decision in *Williams* v. *Nottawa,* 104 U. S. 209, we said that it "establishes that the Circuit Court of the United States cannot, since the act of 1875, entertain a suit upon municipal bonds payable to bearer, the real owners of which have transferred them to the plaintiffs of record for the sole purpose of suing thereon in the courts of the United States for the benefit of such owners, who could not have sued in their own names, either by reason of being citizens of the same State as the defendant, *or by reason of the insufficient value of their claims.* The principle of that decision is equally applicable to suits in equity to assert equitable rights under such bonds." Again, in the same case: "It follows, that these bills should have been dismissed so far as regarded the bond for $200, owned by a citizen of New York in the first case, and also to all the bonds owned by citizens of New Jersey in either case. But no valid objection has been shown to the maintenance of these bills, so far as regards those bonds of which plaintiffs are the bearers, and which are actually owned, either by themselves, or by other citizens of New York or Pennsylvania, to a sufficient amount *by each owner* to sustain the jurisdiction of the Circuit Court."

The same view of the act of 1875 was taken in *Lake Commissioners* v. *Dudley,* 173 U. S. 243, 252, which was an action upon coupons payable to bearer. This court said : "From the evidence in this cause of Dudley himself it is certain that he does not in fact own any of the coupons sued on, and that his name,

with his consent, is used in order that the Circuit Court of the United States may acquire jurisdiction to render judgment for the amount of all the coupons in suit, a large part of which are really owned by citizens of Colorado, who, as between themselves and the Board of Commissioners of Lake County, could not invoke the jurisdiction of the Federal court, but must have sued, if they sued at all, in one of the courts of Colorado. It is true that some of the coupons in suit are owned by corporations of New Hampshire, who could themselves have sued in the Circuit Court of the United States. But if part of the coupons in question could not by reason of the citizenship of the owners have been sued on in that court, except by uniting the causes of action arising thereon with causes of action upon coupons owned by persons or corporations who might have sued in the Circuit Court of the United States, and if all the causes of action were thus united for the collusive purpose of making a 'case' cognizable by the Federal court as to every issue made by it, then the act of 1875 must be held to apply, and the trial court, on its own motion, should have dismissed the case without considering the merits."

Does the record show that the Circuit Court was without jurisdiction of some of the causes of action embraced by the complaint? We say "record," because this court will not reverse a judgment for want of jurisdiction in the Circuit Court, if its jurisdiction sufficiently appears either from the pleadings or from the record. *Railway Company* v. *Ramsey*, 22 Wall. 322; *Briges* v. *Sperry*, 95 U. S. 401; *Robertson* v. *Cease*, 97 U. S. 646, 648. The complaint here shows diverse citizenship, as between the plaintiff and the defendant city, but the record reveals the fact that the plaintiff included in his suit a large number of claims owned by citizens of States other than California, but which, by reason of their small amount, could not have been sued on separately in the Circuit Court by the persons or corporations, the real owners, who put them in plaintiff's hands for collection.

Of this there can be no doubt. The entire issue of refunding bonds was 360, of $1000 each, numbered consecutively from one to three hundred and sixty. They were of the character

known as "serials," each series consisting of nine bonds. The first series included the bonds numbered from one to nine, both inclusive, and each succeeding series included the nine bonds numbered consecutively after those embraced in the next preceding series. The bonds of the first series fell due April 15, 1895, and were the only bonds that had become due when the present action was brought. The remaining series were made payable in consecutive order on the 15th day of April in each succeeding calendar year thereafter until and including the year 1934. Now, this suit is for the amount due on nine of the forty bonds of $1000 each, constituting the first series, and falling due April 16, 1895, and two hundred and eighty-two coupons of $50 each, all which coupons, above the coupon of bond No. 40 of the first series, were attached to bonds that were not yet due. No owner of a $50 coupon attached to a bond not due could have sued upon it in the Circuit Court. Each coupon of that amount was a complete instrument, capable of supporting a separate action, in the proper forum, without reference to the maturity or ownership of the bonds to which they were attached. *Koshkonong* v. *Burton*, 104 U. S. 668, and authorities there cited; *Elgin* v. *Marshall*, 106 U. S. 578. No owner of coupons, aggregating less than $2000, could have sued in the Circuit Court by reason of the bonds to which they were attached (but which were not due) exceeding the jurisdictional amount. But when the several owners of $50 coupons which were due, but which coupons were attached to bonds not due, put them all in the hands of the plaintiff for collection, the amount appeared to be sufficient for purposes of jurisdiction. Thus a case was made by which the Circuit Court was led to take cognizance of certain claims too small for its jurisdiction if they had been severally sued on by the real owners, although there was jurisdiction as to the parties who owned eight of the nine bonds in suit. It also appears that one of the transferrers of the plaintiff owned only one bond of a $1000. The value of the matter in dispute, as to him, was only the amount of that bond and one coupon of $50.

We adjudge that, as the plaintiff does not own the bonds or coupons in suit, but holds them for collection only, the Circuit

Court was without jurisdiction to render judgment upon any claim or claims, whether bonds or coupons, held by a single person, firm or corporation against the city and which, considered apart from the claim or claims of other owners, could not have been sued on by the real owner by reason of the insufficiency of the amount of such claim or claims.

·The specifications of error assigned cover eighty pages of the elaborate brief of counsel for the city. They present many minor questions that are not discussed in this opinion. But what has been said embraces every point of substance or that requires consideration and disposes of the case upon its real merits.

*The judgment of the Circuit Court of Appeals is reversed, with directions to the Circuit Court to set aside its judgment and enter such judgment as may be in conformity with this opinion.*