13255

BOLTON *ET AL.* v. WHARTON, MAYOR, *ET AL.*

(161 S. E., 454)

244

248

252

258

260

*Messrs. Haynsworth & Haynsworth* and *Sawyer & Sawyer,* for George H. Burr & Company, appellant,

*Messrs. P. D. Barron* and *Hughes & Russell,* for respondent,

October 14, 1931.

The opinion of the Court was delivered by Mr. Chief Justice Blease.

The able and interesting decree of Honorable Thomas S. Sease, Circuit Judge, in this case, is convincing that the conclusions reached by him are correct. It will be reported.

In addition to the many authorities cited by the Circuit Judge to sustain his conclusions, we call attention to the very recent case of *City of Sanford, Florida, v. Chase National Bank of City of New York*, 50 F. (2d), 400, 405, decided by the Circuit Court of Appeals, Second Circuit. In that case, where the Court had under consideration the liability of the City of Sanford on certain municipal bonds executed by the city authorities, the validity of which was questioned by the city, which bonds were wrongfully pledged with the defendant bank by a Florida bank, the Court held that the city was not liable on the bonds, and in the course of the opinion, Judge Manton for the Court said this: "Municipal bonds executed by the properly authorized officials will estop the municipality as against *bona fide* holders for value of the bonds from asserting that necessary conditions precedent to the issuance of the bonds have not been fulfilled. *Knox County v. Aspinwall*, 62 U. S. (21 How.), 539, 16 L. Ed., 208; *Waite v. Santa Cruz*, 184 U. S., 302, 22 S. Ct., 327, 46 L. Ed., 552; *Presidio County v. Noel-Young Bond Co.*, 212 U. S., 58, 29 S. Ct., 237, 53 L. Ed., 402. *But, if the municipality has no statutory power to issue the bonds under any possible situation of facts, it cannot be estopped by any recitals in them from setting up its*

*lack of power. Northern Bank v. Porter Township,* 110 U. S., 608, 4 S. Ct., 254, 28 L. Ed., 258; *Merrill v. Monticello,* 138 U. S., 673, 11 S. Ct., 441, 34 L. Ed., 1069." (Italics ours.)

In the case at bar, the City of Union and none of its officials had either constitutional or statutory authority to issue the notes (regarded as bonds under our decisions) for the purpose for which they were issued.

If the holding of Judge Sease in this case is incorrect, every municipality in South Carolina can be bankrupted, and the property of its taxpayers confiscated, through the issuance of bonds not legally authorized.

The decree of the Circuit Judge is affirmed.

MESSRS. JUSTICES STABLER and CARTER and MR. ACTING ASSOCIATE JUSTICE JOHN I. COSGROVE concur.

MR. JUSTICE COTHRAN (dissenting) : This action, commenced in September, 1928, is by the plaintiffs, as taxpayers of the City of Union, against the defendants, members of the city council, and the defendants George H. Burr & Company, for the purpose of having certain notes, issued by the City of Union to the defendants Burr & Company, declared invalid and for an injunction against the city council from paying the notes.

The complaint is based really upon certain renewals of the original notes; but as the liability of the city depends upon its liability upon the original notes, it will tend to attain the justice of the case, to attend mainly to the circumstances under which they were executed and delivered. I will premise by saying that, behind the legal and admissible documents and circumstances of the case, there appears as a ghost the suspicion, practically a certainty, that the city council was taken in by a smooth artist, who played with consummate skill upon the commendable purpose of these guardians of the public weal, to secure "such benefits from a proposed expenditure as will accrue from increased taxable values, from enhancement of property values generally, and

from increased impetus to the commercial life of the community. * * *" (Justice Marion, in the *Haesloop case,* 123 S. C., 272, 115 S. E., 596, 601) ; there is no doubt but that he sold the a "gold brick," but it is greatly to their credit that in their answer they are not disposed to repudiate the obligation they are under to those innocent of the fraud imposed upon them. I appreciate the fact that it is difficult to get away from the "coloring matter" of the case; it should not affect the rights of those who had no participation in it.

A brief résumé of this matter, really foreign to the main issue, is interesting, simply as showing the adeptness of the "puller in."

It appears that one Edelstein, in January, 1927, visited the City of Union; results demonstrate that it was not only a visit but a visitation; he proposed to be interested in moving a silk mill owned by Liberty Fabrics Corporation of New Jersey to Union, S. C.; after he had been in Union some days promoting his project to induce the community of Union to raise so much capital to move the mill to Union and operate it, he approached the Mayor with a proposition that the city undertake to underwrite a certain portion of the stock of the corporation; several meetings of council were held, and finally an agreement was authorized by the city council set out in the testimony as Exhibit A, dated January 12, 1927, signed by the Mayor and City Treasurer and sealed, by which the city undertook to "guarantee and underwrite" $45,000.00 of the capital stock of the corporation, to be located at Union, upon certain conditions and, in addition, to execute its note to the corporation for $45,-000.00, due twelve months after date, at 6 per cent. interest from maturity (a most remarkable undertaking) ; Edelstein, upon his part, undertook to procure from certain mill engineers a report that the corporation would make annual profits of at least $100,000.00 (the cheese to the mouse trap) ; upon failure thereof, the guaranty was "off."

Later, on May 12, 1927, the city and Edelstein entered in another and substituting agreement, by which the city, with the approval and direction of the council, undertook, in lieu of the guaranty agreement of January 12th, to execute and deliver to Edelstein $45,000.00 of notes for $45,-000.00 of stock of the corporation. In compliance with this agreement notes to the stated amount were executed and delivered to Edelstein.

On the same day Edelstein executed his note to the City of Union for $19,300.00, the purpose of which is not fully explained otherwise than that it was an additional consideration for the execution of the $45,000.00 of notes by the city.

It appears that the agreement of the city to give the $45,-000.00 of notes must have been orally consummated before its date, May 12th, for on May 3 Edelstein wrote Burr & Company: "I am here in the interest of several mills which are moving from the East. In a recent conversation with the local Mayor, I find that the City of Union would like to discount a note for twelve months. If your firm is interested in this paper, please wire to me at once discount rate," etc.

On May 6, Burr & Company replied by letter: " *   *   * In regard to the City of Union, S. C. Note, we would be pleased to have you advise us further details, if you will. What is the amount of the issue, purpose, place of payment, and what legal opinion will be rendered. If you will give us this information, we will be glad to make a bid on the note if it looks attractive."

On May 9, Edelstein wired Burr & Company: " *   *   * Amount issue $45,000.00, place payment Hanover National Bank, purpose pay current indebtedness.   *   *   * " (Edelstein knew perfectly well that this was not true.)

On the same day Burr & Company wired Edelstein that they would take "the forty-five Unions at 5½ per cent."

On May 10, Burr & Company wired Edelstein to have the notes made in five and ten thousand pieces.

On the same day Edelstein wired Burr & Company that it would be satisfactory to have the notes made as suggested, and asking them to advise to whom the notes should be made payable.

On the same day Burr & Company wired Edelstein to have the notes made payable to Burr & Company or bearer, and directing: "Please advise date of note and maturity. Is note interest bearing or discount Stop Tell City Treasurer send receipt for money with notes to Bank, receipt to be delivered to us when notes paid for."

On the same day Edelstein wired Burr & Company that the rate was satisfactory and that he was making arrangements to forward "note."

On May 11, Edelstein wired Burr & Company that the notes were dated that day, payable one year, advance discount deducted. (I do not understand why he gave the dates as 11th when they unmistakably show 12th.)

On May 11th, the notes were forwarded to New York by Edelstein; on the same day Burr & Company wired Edelstein that the notes should be certified by the city attorney; the note that had then been forwarded bore the certificate of the Mayor and not of the attorney; Edelstein then wired Burr & Company to return them with correct form, which Burr & Company did; Edelstein then had new notes signed up as Burr & Company wished, three of them in the sum of $10,000.00 each and three of $5,000.00 each, totaling $45,000.00.

Each note bore upon its face the following certificate: "We hereby certify that all acts, matters and things required to be done to make the above note of the City of Union, State of South Carolina for Five Thousand & No/100 Dollars ($5,000.00), dated May 12th, 1927, and due May 12th, 1928, issued by the Mayor and City Council of the City of Union, State of South Carolina a valid and bind-

ing obligation of the City of Union, State of South Carolina, have been done and fully performed, and that same was dully authorized in Council Meeting with all members present on the 28th day of April, 1927, and that this note is within the legal debt limit of the City of Union, State of South Carolina, and that this note is for the purpose of paying current obligations."

It was signed by the Mayor, attested by the clerk of council, and was sealed with the official seal of the city.

It is exceedingly important to observe the disposition that was made of these original notes:

The net proceeds of the $45,000.00 of notes payable to Burr & Company, after deducting the discount, were calculated to be $42,525.00; on May 13th, the Mayor issued a direction to the City Treasurer to pay this amount to Liberty Fabrics Corporation; on the same day the Treasurer drew a draft or check upon the National Park Bank of New York for said amount, payable to the corporation, which contained this statement: "To be held until Geo. H. Burr & Co., discounts $45,000.00 City of Union notes, and deposits the proceeds to cr. of City of Union, S. C., at National Park Bank, New York City," signed "City of Union, by W. D. Arthur, City Treasurer" (for some unexplained reason this was recalled); another dated May 12th, for the same amount, was drawn by the city, upon Burr & Company, payable to "the order of ourselves"; accompanying it, forwarded to the National Park Bank, were the notes of the city (the original notes), for $45,000.00 and a receipt by the city in the following words: "$42,-538.75 Union, South Carolina, May 12th, 1927. Receipt and credit of forty-two thousand five hundred thirty-eight 75/100 dollars at the National Park Bank of New York City, New York is hereby acknowledged by the City of Union, State of South Carolina. City of Union, South Carolina, by W. D. Arthur. W. D. Arthur, City Clerk and Treasurer." On May 19th, the National Park Bank notified

Burr & Company as follows: "At the request of the City Treasurer of Union City, S. C., we beg to hand you herewith notes of the City of Union aggregating $45,000.00, together with draft on you and receipt for the proceeds. Please hand our messenger statement and check to cover." On May 19th, Burr & Company paid the draft to the National Park Bank, signed "City of Union, by W. D. Arthur, City Treasurer." (For some reason unexplained this draft was recalled, and another was drawn of like import, the only difference between the two, apparently, being the omission, in the last draft, of the statement above quoted.) The latter draft was dated May 19th and was delivered to the attorney of the corporation who receipted for it on the same day.

From these rather tedious details it is clear that the proceeds of the notes discounted with Burr & Company went into the hands of the fiscal agents of the city, in payment of the stock in the silk mill corporation which they had agreed to purchase from Edelstein. Through their co-operation with him, the notes had been transmitted to the National Park Bank, along with a draft by the city, upon Burr & Company, for the amount of the proceeds, and a statement by the city acknowledging that they had received credit at that bank for the amount. The draft was evidently sent to the Park Bank for collection, and the supporting papers accompanied it to show to Burr & Company that the city had received the proceeds which were placed to its credit with the Park Bank. The latter notified Burr & Company, of the draft; they paid it and took up the notes accompanying it. It is assumed that the check on the Park Bank in favor of the corporation was paid.

The contentions of the defendants, Burr & Company, are:

1. That they are holders for value of the notes without notice of their alleged invalidity set up by the plaintiff taxpayers as a ground for their cancellation, and that their rights as such should prevail over the alleged invalidity of the notes;

2. That the city is bound by the recitals contained in the certificates attached to the notes;

3. That Burr & Company were not bound to see to the application of the proceeds of the notes to the legitimate municipal purposes of the City of Union.

I. Are Burr & Company holders for value of the notes in question, without notice of their alleged invalidity, and, if so, may their rights prevail over such invalidity?

The decree of the Circuit Judge appears to proceed upon the theory that the payee of a negotiable promissory note, for which he has parted with his good money, without notice of any infirmity in the note, cannot claim immunity from defenses which the maker may interpose, for the reason that he cannot be considered a holder in due course, as defined in the Negotiable Instruments Act; the fact that he may be a holder for value, under the circumstances stated, will not avail him.

There is much contrariety of opinion in the decided cases upon the issue whether the payee can be considered a holder in due course, as will appear in an extended note upon the subject in 32 A. L. R., 289.

I do not consider it necessary to enter upon a discussion of this issue, as it seems perfectly clear that the payees of the notes in question were holders for value, and entitled to practically the same immunity as is accorded a holder in due course.

I do not think that there can be a doubt that Burr & Company were *bona fide* holders of the notes for value. They were executed by the city authorities for the purpose, openly declared, of meeting current obligations of the city. The mayor testified that he turned the notes over to Edelstein; but the unquestioned fact is that these notes, accompanied by a receipt signed by the city authorities, acknowledging the payment in full, and accompanied also by an order on Burr & Company to pay the face value of the notes, less interest, were turned over to the Bank of Union for account

of the city, and by that bank were forwarded to the National Park Bank of New York, and that bank presented the notes and order and received from Burr & Company the face value of the notes, less the interest, and delivered to Burr & Company the notes, the receipt, and the order. The bank then placed this fund to the credit of the City of Union, and the City of Union issued its own check for the money

It does not appear that there was any sort of business connection between Edelstein and Burr & Company. Edelstein posed as an industrial promoter, at the time in Union upon his own private business, disconnected entirely with that of Burr & Company, brokers in the City of New York, away from the then location of the silk mill. On May 3, 1927, he wrote Burr & Company, explaining that he was in Union "in the interest of several mills which are moving from the East." He would hardly have written this if he had been at all connected with Burr & Company; there appears no connection between this explanation and what followed in his letter: "In a recent conversation with the local Mayor, I find that the City of Union would like to discount a note for twelve months. If your firm is interested in this paper, please wire to me at once discount rate," etc. Burr & Company replied to this letter on May 6th, asking him to give details of the note, "what is the amount of the issue, purpose, place of payment," etc., and expressing a willingness to take the matter up with him and "make a bid on the note if it looks attractive." Edelstein replied by wire on the 9th, stating that the amount of the issue was $45,000.00, place of payment Hanover National Bank, "purpose pay current indebtedness." Burr & Company repiled same day saying that they would take $45,000.00 Union note at 5½ per cent as per letter. Then followed the transactions hereinbefore detailed.

Burr & Company did not know, and had no reason to believe, that any part of the proceeds would be used for any purpose other than the payment of current obligations. They

were justified in believing that the money would be used for that purpose alone. Edelstein, in advising them that the City of Union would desire to borrow certain moneys, stated that this was for the purpose of paying current obligations. There was nothing in any of the correspondence or communications that indicated otherwise. The recitals contained in the notes represented that this was the purpose for which the money was being borrowed, and represented that all acts and things had been done which were necessary under the law to make the notes a valid obligation.

If then, as clearly appears, Burr & Company had no notice of the real purpose of the transaction, other than appeared from the information imparted by Edelstein and the specific statements of the fiscal agents of the city, they became *bona fide* holders of the notes for value and entitled to be protected against their alleged invalidity.

The case of *Witte v. Williams*, 8 S. C., 290, 28 Am. Rep., 294, is conclusive on the point that the payee of a bill of exchange or promissory note, who pays value without knowledge or notice of any defect or fraud, is a *bona fide* holder for value, and that the paper in his hands is not subject to such defense.

In that case the defendant, Mrs. Sallie G. Williams, delivered to the firm of J. & J. D. Kirkpatrick three drafts drawn by herself upon that firm, one draft being for $1,-000.00 and the other two drafts for $2,500.00 each. In each of them there were blanks or the date, time of payment, and name of payee. These drafts were left by Mrs. Williams with Kirkpatrick for the purpose of securing an account owing by her to Kirkpatrick. Mrs. Williams had a settlement with the Kirkpatricks, in which her account was fully paid, but she neglected to take up the drafts. Thereafter Kirkpatrick filled in the blanks for the dates and the time of payment, and inserted the name of C. O. Witte as payee, from whom full value was received. The referee held that the instruments were bills of exchange, and that Witte was

a *bona fide* holder for value. He further held that Mrs. Williams had paid her account to the Kirkpatricks, and that they had fraudulently filled out the blanks, and negotiated the bills with Witte, but that Witte, being a *bona fide* holder for value, was not affected with the fraud. The Circuit Judge reversed the report of the referee upon the ground that the circumstances, including the dissolution of the firm of J. & J. D. Kirkpatrick, were sufficient to put the plaintiff upon notice, and that he did not occupy the position of a *bona fide* holder, who had acquired title in good faith for a valuable consideration from one capable of transferring it and without notice of any defect. On appeal, the Supreme Court reversed this judgment and affirmed the report of the referee, holding that Witte was a *bona fide* holder of a negotiable paper for valuable consideration. The fact that he was named as payee did not prevent him from claiming protection as a *bona fide* holder for value.

*Witte v. Williams* was followed by *Fowler v. Allen*, 32 S. C., 229, 10 S. E., 947, 949, 7 L. R. A., 745, in which the question arose as to the rights of the payee of a negotiable note who had received it in good faith for value. The note was signed by Eber C. Allen as principal, and his mother, Harriett Allen, as surety. Mrs. Allen defended upon the ground that she had signed the note as surety upon the condition that it should not be delivered to the payees until two judgments (for which the note was given) were marked satisfied. The testimony tended to establish this agreement. There was a conflict as to whether notice of this agreement was communicated to the plaintiff, and this question was left to the jury, who found a verdict for the plaintiff. The Circuit Judge charged that, even if Mrs. Allen did sign the notes upon the condition stated, she would, nevertheless, be liable unless the plaintiff had notice of such condition. The following is the language of the Court:

"Here the principal debtor, after signing the notes, takes them to the defendant for the purpose of procuring her sig-

nature as his surety, in accordance with the agreement made by him with the plaintiffs; and, when he delivers them properly signed, surely the payees cannot be affected by any private instructions which the surety may have given to her principal, unless the same were communicated to the payees. The surety, by signing the notes complete in form, and placing them in the hands of her principal to be delivered to the payees, even though upon a condition, has placed it in the power of her principal to deceive the payees; and, if loss ensued, it must fall upon the one who contributed to that loss, rather than upon the innocent payees, who were left in ignorance of the conditions upon which the notes were signed. The principal debtor was the agent of the surety, and not of the creditor, and, if he has done an act for the doing of which he was clothed with apparent authority, even though it may have been done in violation of his private instructions, the person who invested him with such apparent authority must take the consequences. Any other view would, it seems to us greatly impair, if it did not absolutely destroy, that confidence so necessary to the business interests of the community in negotiable paper; for it would render it necessary, before a negotiable note could be discounted by a bank, or by a private individual, that inquiry should be made of the indorser or surety as to whether they had signed their names upon conditions, and this, surely, could not be tolerated. That these views are well supported by authority may be seen by reference to the case of *Jordan v. Jordan,* 10 Lea [Tenn.], 124, 43 Am. Rep., 294, where the subject is fully discussed, and the authorities cited, also, *Marks v. National Bank,* 79 Ala., 550, 58 Am. Rep., 620, as well as the cases cited in 6 Amer. & Eng. Cyclop. Law, 860, note 2.

"It is urged, however, that the notes in this case, though negotiable in form, being still in the hands of the original payees, are not entitled to the protection which paper of that class would receive in the hands of a *bona fide* holder for value, to whom they had been transferred before ma-

turity. But we do not think that this can affect the question. Of course, if these notes had been transferred before maturity to an innocent holder for value, no such question could arise; and therefore the question in the cases we have cited arose in cases where the original payees were still the holders. The plaintiffs here agreed to extend indulgence for a stipulated time if the debts were secured by the notes in question, and that was a valuable consideration, outside of the original debt; and the indulgence was extended for the time stipulated—in fact for a much longer time—upon the faith of defendant's suretyship; and now to deprive them of the consideration upon which such indulgence was extended on the ground that the principal debtor has violated his private instructions from his surety, of which the plaintiffs had no notice, would, it seems to us, operate as a fraud upon the plaintiffs."

In the subsequent case of *Sullivan v. Williams,* 43 S. C., 489, at page 505, 21 S. E., 642, the Supreme Court extended the doctrine of the case of *Fowler v. Allen* to the case of non-negotiable instruments, holding that the surety on an attachment bond, who had signed the bond on the condition that it should not be delivered until executed by the principals, was precluded from setting up the defense that the signatures of two of the principals had been forged and quoted the opinion in *Fowler v. Allen, supra,* as holding that the doctrine of that case "does not rest alone upon the peculiar character of negotiable paper, but upon the well-settled principle" that where one of two innocent persons must suffer, the loss should fall upon him who put it in the power of a third person to cause such loss.

The cases of *Witte v. Williams, Fowler v. Allen* and *Sullivan v. Williams* have been cited by numerous subsequent cases, in none of which has the doctrine above stated been questioned.

It will thus be seen that the doctrine which affords protection to one who receives a negotiable instrument for full

value, and without notice of any defect, is independent of the special protection accorded by the Negotiable Instruments Law (Civ. Code 1922, § 3652 *et seq.*)

II. Is the city bound by the recitals contained in the certificates attached to the notes?

I do not at all question the position taken by the counsel for the respondents that the city authorities had no right or power to subscribe for stock in the silk mill proposition, and to execute notes therefor, which would be binding obligations upon the city; that they were shamefully taken in is perfectly clear, and if they could be relieved from the incubus of the debt, without violating the rights of innocent third parties, I should be glad to see it done; but under the circumstances, it would, in my opinion, be a violent wrench to establish principles of law and justice to do so in this case.

Edelstein, who manifestly was acting as agent of, or in co-operation with, the city council, in floating the proposed notes, in response to the inquiry of Burr & Company, distinctly notified them that the purpose of the loan was to "pay current obligations"; the notes with the accompanying certificate signed by the mayor, attested by the clerk and treasurer of the city, and with the official seal attached, notified Burr & Company that they were "for the purpose of paying current obligations"; Burr & Company had no other information upon the subject or cause to question the accuracy of these statements. They are presumed to have know that under the statute of this State, Section 4554, Code of 1922, Volume 3, the city council was vested with the following authority: "That in the anticipation of the collection of taxes in any fiscal year said city or town council, whether such city or town be chartered by special Act of the General Assembly or under the general law, may from time to time, as occasion may require, borrow money for corporate purposes on its note or notes, and pledge the taxes levied, or to be levied, in said year for corporate

purposes, for the payment of such note or notes and the discount or interest thereon, and such note or notes it is hereby authorized to discount generally, if desired, without responsibility to the person or corporation advancing money on said security, to see to the application of the funds realized thereon."

They were likewise acquainted with the law that the constitutional provision limiting the bonded indebtedness of municipal corporations to 8 per cent. of the assessed value of the taxable property has no application to an indebtedness of this character. Constitution, Art. 8, § 7. See also *Briggs v. Greenville County,* 137 S. C., 288, at page 305, 135 S. E., 153; *Barnwell v. Matthews,* 132 S. C., 314, at page 318, 128 S. E., 712; *Sullivan v. City Council of Charleston,* 133 S. C., 189, 133 S. E., 340; *State v. Moorer,* 152 S. C., 455, 150 S. E., 269.

The statute does not require that the note contain a pledge of the taxes. The language of the statute is that the city council may borrow money on its note or notes and pledge the taxes to be levied in said year. If it be thought necessary that the ordinance authorizing the issue of such notes should contain a pledge of the taxes, then the certificate, representing that everything had been done which was necessary to the validity and legality of the note, would be a representation that such pledge had been actually made.

The authorities hereafter cited show conclusively that a certificate of the character issued in this case is a representation that the note was issued for the authorized purpose and that it was in compliance with all the requirements of law, and that everything had been done necessary to make the note a legal debt. These authorities further show that a party purchasing these notes from the city would be entitled to rely upon this representation and would not be charged with the duty of examining the city ordinances and public record in order to ascertain whether the representations contained in the certificate were true.

NOTE.—I here reproduce, quite *in extenso*, the very excellent argument of counsel for the appellants, which meets with my unqualified commendation and approval:

## THE SOUTH CAROLINA CASES ON THIS SUBJECT

The leading case in this State upon the subject under the discussion is the *Bond Debt case*, 12 S. C., 200. Mr. Justice McIver, delivering the opinion of the Court, said, pages *272-276* of 12 S. C.:

"There is as little doubt that states which issue negotiable paper incur the same responsibilities which attach to individuals or corporations in like case. *United States v. Bank of Metropolis*, 15 Pet., 392, 10 L. Ed., 744; *Murray v. City Council*, 96 U. S., 445, 24 L. Ed., 760; the Floyd Acceptances, 7 Wall, 666, 19 L. Ed., 169. As is said in the last-named case, 'it must be taken as settled that when the United States becomes a party to what is called commercial paper—by which is meant that class of paper which is transferable by endorsement or delivery, and, between private parties, is exempt in the hands of innocent holders from inquiry into the circumstances under which it was put in circulation—they are bound, in any Court to whose jurisdiction they submit, by the same principles that govern individuals in their relations to such paper.' * * *

"If, then, the bonds here in question are negotiable securities and the holders thereof are *bona fide* holders, our next inquiry will be as to the rule governing that class of securities in the hands of such holders. The rule, as stated by one of the most recent writers on this branch of commercial law, is that if such securities are issued by competent authority, they are, in the hands of such holders, unaffected by, and exempt from inquiry into, the circumstances under which they were put into circulation. 2 Dan. on Neg. Inst. §§ 1502-3. Now, as corporations or states issuing such paper must necessarily do so through the instrumentality of officers or agents, the only inquiry in such cases is, whether

the officer or agent has been entrusted with authority to make and issue the paper, and it is not competent to inquire into his conduct in making the issue. If he has been guilty of irregularities or even frauds in exercising the power with which he has been entrusted, the loss thereby occasioned must fall upon the party who entrusted him with such power, and not upon the innocent holder, who has taken the paper in the usual course of trade. The rule, as stated in (Marshall County) *Supervisors v. Schenck*, 5 Wall., 784 (18 L. Ed., 556), is: 'When a corporation has power, under any circumstances, to issue negotiable securities, the decision of this Court is that the *bona fide* holder has a right to presume they were issued under the circumstances which give the requisite authority, and they are no more liable to be impeached for any infirmity in the hands of such holder than any other commercial paper.' And this rule has been re-affirmed in the recent case of *San Antonio v. Mehaffy*, 96 U. S., 314, 24 L. Ed., 816, and again in the still more recent case of *County of Macon v. Shores*, 97 U. S., 278, 279, 24 L. Ed., 889. In the case of *Commissioners of Knox County v. Aspinwall*, 21 How., 545, 16 L. Ed., 208, it was held that where bonds have been issued by the board of county commissioners, under the authority of an act of the legislature, which prescribed certain conditions upon which the bonds were to be issued, 'the purchaser of the bonds had a right to assume that the vote of the county, which was made a condition to the grant of the power, had been obtained, from the fact of the subscription by the board to the stock of the railroad company and the issuing of the bonds. The bonds, on their face, import a compliance with the law under which they were issued. "This bond," we quote, "is issued in part payment of a subscription of $200,000 by the said Knox County to the capital stock, etc., by order of the board of commissioners," in pursuance of the third section of act, etc. The purchaser was not bound to look further for evidence of a compliance

with the conditions to the grant of the power.' In the comparatively recent case of *Coloma v. Eaves,* 92 U. S., 490, 23 L. Ed., 579, the foregoing case is characterized as a leading case upon the subject, and is said to have established two propositions. First. 'That the issue of the bonds containing a recital that they were issued under and in pursuance of the legislative act, was a sufficient basis for an assumption by the purchaser that the conditions on which the county (in that case) was authorized to issue them had been complied with, and that the purchaser was not bound to look further for evidence of such compliance, though the recital did not affirm it.' Second. That 'where legislative authority has been given to a municipality, or to its officers, to subscribe for the stock of a railroad company, and to issue municipal bonds in payment, but only on some precedent condition, such as a popular vote favoring the subscription, and where it may be gathered from the legislative enactment that the officers of the municipality were invested with power to decide whether the condition precedent has been complied with, their recital that it has been, made in the bonds issued by them and held by a *bona fide* purchaser, is conclusive of the fact and binding upon the municipality.' In *Coloma v. Eaves,* it is said that the first proposition has been re-affirmed in the cases of *Moran v. Miami County,* 2 Black, 732, 17 L. Ed., 342; *Mercer County v. Hackett,* 1 Wall., 83, 17 L. Ed., 548; (*Marshall County*) *Supervisors v. Schenk,* 5 Wall., 784, 18 L. Ed., 556; and in *Myer v. Muscatine,* 1 Wall., 384, 17 L. Ed., 564, and, though doubted and dissented from by individual Judges, has never been overruled. But, so far as the second proposition is concerned, it is said that it 'has been so firmly seated in reason and authority that it cannot be shaken.' This case has been repeatedly recognized and affirmed in a number of subsequent cases among which may be mentioned *Marcy v. Oswego,* 92 U. S., 637, 23 L. Ed., 748; *Humboldt v. Long,* 92 U. S., 642, 23 L. Ed., 752; (*Douglas County*) *Commissioners v. Bolles,* 94 U. S.,

104, 24 L. Ed., 46; *County of Warren v. Marcy*, 97 U. S., 96, 24 L. Ed., 977. That the effect of these decisions is to re-affirm both of the propositions laid own in *Knox County v. Aspinwall*, is made manifest by what is said in the dissenting opinion of Mr. Justice Bradley in *Coloma v. Eaves*, 92 U. S., 493, 23 L. Ed., 579, and in the dissenting opinion of Mr. Justice Miller in *Humboldt v. Long*, 92 U. S., 649, 23 L. Ed., 752. We think, therefore, that the result of the cases in the Supreme Court of the United States clearly is, that when an act of the legislature authorizes the issue of bonds by a municipal corporation upon certain conditions therein named, and the bonds are issued by the proper officers of such corporation, containing a recital that they are issued under the authority conferred by such act, that such recital is conclusive in favor of a *bona fide* holder—that all the necessary conditions named in the act have been complied with, as a purchaser is not bound to look beyond the legislative act and the recitals contained in the bonds. As was said in *Marcy v. Oswego*, 92 U. S., 641, 23 L. Ed., 748, 'the subsequent issue of the bonds containing the recital above quoted—that they were issued "by virtue of, and, in accordance with," the legislative act, and in "pursuance of, and in accordance with, the vote of three-fifths of the legal voters of the township"— was another determination, not only of the result of the popular vote, but that all the facts existed which the statute required in order to justify the issue of the bonds.' * * *

"It is true that the cases which establish the foregoing principles arose upon bonds issued by municipal corporation; but if, as we have seen, negotiable bonds issued by states are subject to the same rules which govern that class of paper when issued by individuals or corporations, it is difficult to conceive how this can make any difference—and, indeed, it seems to be conceded in the argument on both sides that there is no distinction. The rule grows out of the principles which apply to that class of paper, and is in no

wise dependent upon the character of the parties who make or issue such paper."

The doctrine announced in the Bond Debt Case has been approved by numerous state decisions, among others are *Robertson v. Tillman,* 39 S. C., 298, 17 S. E., 678; *Ehrlich v. Jennings,* 78 S. C., 269, 58 S. E., 922, 125 Am. St. Rep., 795, 13 Ann. Cas., 1166; and *State v. Blease,* 95 S. C., 403, 79 S. E., 247, 254.

In the latter case the following propositions were stated as being firmly established:

"(1) The refunding of a valid existing debt does not increase the debt of the State, and therefore needs not the sanction of the qualified electors, which is required by Section 11 of Article 10 of the Constitution before the public debt can be increased.

"(2) The liability of the state upon negotiable paper, issued by competent authority, is the same as that which attaches to private individuals under like circumstances.

"(3) Holders of such paper, in the absence of allegation to the contrary, are presumed to be innocent purchasers thereof for value, before maturity, and without notice of any objection to which it may be liable.

"(4) When authority to issue such paper exists, neither irregularities nor frauds on the part of the officers or agents of the state who are intrusted with the exercise of such authority will affect it in the hands of such holders.

"(5) The State is estopped to deny recitals on the face of such paper in the hands of such holders."

*Lucas v. Barringer, Mayor,* 120 S. C., 68, 112 S. E., 746, 748, was a proceeding to enjoin the mayor and city council of Florence from issuing bonds of the city on the ground that the petition filed with the city council had not been signed by a majority of the freeholders; that there were various irregularities, and that the bonds were in excess of the constitutional limitation. The opinion of Judge Shipp was adopted by the Supreme Court. In this opinion

Judge Shipp, among other things, said: "If the bonds had already been sold and were in the hands of holders for value, I would not have considered any testimony other than the declaration of city council that the names on the petitions constituted a majority of freeholders in the City of Florence as appears by the tax books, for certainly a purchaser of bonds of a municipality or other political subdivision in this State has a right to rely on the truth of a declaration of fact which is peculiarly within their knowledge, made by the authorities in such municipality or political subdivision, and as against the holder for value of such bonds the truth thereof cannot be attacked."

In *Jones v. Camden,* 44 S. C., 319, 323, 23 S. E., 141, 143, 51 Am. St. Rep., 819, the Court said: "Purchasers of the bonds of a municipal corporation are only bound to inquire whether the power to issue such bonds has been conferred, and they are not bound to see to the application of the proceeds. See Bond Debt cases, 12 S. C., 200. If, therefore, the bonds originally issued were valid obligations of the municipal corporation, as we think they unquestionably were, then bonds issued to pay or renew such valid obligations were alike valid, because issued for a corporate purpose, viz., to pay or retire a valid debt of the corporation."

In *Commissioners of Public Works of Town of Summerville v. Bank of Dorchester,* 115 S. C., 183, 105 S. E., 32, 33, the Court, in referring to the bonds proposed to be issued, said: "The purchaser of the bonds is not bound to see that the commissioners apply the proceeds to the purposes intended, and no other. He may presume that the commissioners will proceed according to law in the performance of their duties. *Jones v. Camden,* 44 S. C., 319, 23 S. E., 141, 51 Am. St. Pep., 819."

These subsequent cases only emphasize the doctrine which was so clearly set forth in the opinion of Judge McIver in the *Bond Debt* case. This doctrine as applied to municipal notes may be summarized as follows:

(1) That in case of irregularity or fraud in the exercise of the power of issuing municipal securities, the loss thereby occasioned must fall upon the party who intrusted the officer with such power, and not upon the innocent holder who has taken the paper in the usual course of trade.

(2) That when a municipal corporation has power, under any circumstances, to issue negotiable securities, the *bona fide* holder has the right to presume that they were issued under the circumstances which give the requisite authority, and they are no more liable to be impeached for any infirmity in the hands of such holder than any other commercial paper.

(3) That the issue of notes containing a recital that they were issued under and in pursuance of an ordinance is a sufficient basis for an assumption by the purchaser that the conditions on which the city was authorized to issue them had been complied with, and that the purchaser was not bound to look further for evidence of such compliance.

The following is the concluding statement contained in Justice McIver's opinion: "We think, therefore, that the result of the cases in the Supreme Court of the United States clearly is, that when an act of the legislature authorizes the issue of bonds by a municipal corporation upon certain conditions therein named, and the bonds are issued by the proper officers of such corporation, containing a recital that they are issued under the authority conferred by such act, that such recital is conclusive in favor of a *bona fide* holder—that all the necessary conditions named in the act have been complied with, as a purchaser is not bound to look beyond the legislative act and the recitals contained in the bonds. As was said in *Marcy v. Oswego,* 92 U. S., 641, 23 L. Ed., 748, 'the subsequent issue of the bonds containing the recital above quoted—that they were issued "by virtue of, and, in accordance with," the legislative act, and in "pursuance of, and in accordance with, the vote of three-fifths of the legal voters of the township"—was another

determination not only of the result of the popular vote, but that all the facts existed which the statute required in order to justify the issue of the bonds.' "

Our own Court, in the case of *Ehrlich v. Jennings*, 78 S. C., 269, 272, 58 S. E., 922, 924, 125 Am. St. Rep., 795, 13 Ann. Cas., 1166, said: "Generally in respect to all the commercial business of the government, if an officer specially charged with the performance of any duty authorized to represent the government in that behalf neglects that duty, and loss ensues, the government must bear the consequences of his neglect."

We submit that the city was precluded from going behind the recitals.

### FEDERAL CASES ON THIS SUBJECT

There is a long list of federal cases on this subject holding that recitals of the kind under consideration are equivalent to an official representation that every requirement of law has been complied with, and that persons taking or purchasing the securities are entitled to rely upon the representation and are not bound to examine the municipal ordinances or other public records, and that the city is estopped from saying that the certificate is untrue or that any of the facts are different.

Recitals in city bonds to the effect that they were issued "by virtue of" the city's charter, import compliance with the provisions of the charter. *City of Evansville v. Dennett*, 161 U. S., 434, 16 S. Ct., 613, 40 L. Ed., 760.

In *Chaffee County v. Potter*, 142 U. S., 355, 363–366, 12 S. Ct., 216, 219, 35 L. Ed., 1040, the Court said: "Of course, the purchaser of bonds in open market was bound to take notice of the constitutional limitation on the county with respect to indebtedness which it might incur. But when, upon the face of the bonds there was an express recital that that limitation had not been passed, and the bonds

themselves did not show that it had, he was bound to look no further."

Continuing the Court distinguished the case under consideration from the cases of *Dixon County v. Field*, 111 U. S., 83, 4 S. Ct., 315, 28 L. Ed., 360, and *Lake County v. Graham*, 130 U. S., 674, 9 S. Ct., 654, 32 L. Ed., 1065, because the bond in each of these cases disclosed the fact that the constitutional limitation had been exceeded. The Court said as follows on the subject: "If the face of one of the bonds had disclosed that, as a matter of fact, the recital in it, with respect to the constitutional limitation, was false, of course the county would not be bound by that recital, and would not be estopped from pleading the invalidity of the bonds in this particular. Such was the case in *Lake County v. Graham* and *Dixon v. Field*. But that is not this case."

In *Gunnison County v. Rollins*, 173 U. S., 255, 19 S. Ct., 390, 43 L. Ed., 689, the Court discussed the various cases and reaffirmed the doctrine that where bonds issued by the board of county commissioners recite that all of the requirements of law have been complied with, and that the indebtedness is within the constitutional limitation, and that the bonds are in compliance with law that the county is estopped from disputing these facts as against a purchaser for value without notice.

In *Presidio County v. Noel-Young Bond Co.*, 212 U. S., 58, 29 S. Ct., 237, 53 L. Ed., 402, the Court reaffirmed the doctrine that where bonds recite that they are within the constitutional limitation and are in pursuance of the terms of the statute or law authorizing their issue, the county will be bound and the purchaser will not be under any obligation to investigate any further.

A recital that the bonds or notes are issued in compliance with the statute and Constitution will preclude the municipal corporation from asserting that a tax (required

by the Constitution as a prerequisite to such issue) had not been levied.

In *Hughes County v. Livingston,* 104 F., 306, 317, Judge Sanborn, speaking for the Circuit Court of Appeals for the Eighth Circuit, said: "It is said that the bonds here in question are void because no such provision was ever made for the collection of any tax to pay the interest or principal of the original debt which was funded by the bonds, or the interest or principal of the bonds themselves. * * * The certificate that the bonds were issued in pursuance of the act of 1889 is a certificate that the provision for the collection of the annual tax required by the Constitution which the board of county commissioners· that made the certificate was authorized to make had been already made."

And in *National Life Ins. Co. v. Board of Education* (C. C. A.) 62 F., 778, 788, the Court said: "Among other things, these bonds recite: 'That all conditions and things required to be done, precedent to and in the issuing of said bonds, have duly happened and been performed in regular and due form as required by law.' One of the conditions and things required to be done, precedent to and in the issuing of these bonds, was to provide, in accordance with this constitutional requirement, for the collection of the annual tax to pay the principal and interest of the bonds. The defendant certified on the face of these bonds that this thing had been done. On this certificate the present holders bought the bonds. Can the defendant now prove the falsity of this certificate to defeat them?"

In *Fairfield v. Rural Independent School District,* 116 F., 838, 840, 841, the Circuit Court of Appeals of the Eighth Circuit, through Judge Sanborn, announced as the established doctrine that: "The recital in municipal bonds that they were issued in accordance with the provisions of the enabling statute imports that they were sent forth in pursuance of a lawful and proper resolution or ordinance, and of just and proper action by the governing board of

the municipality. It relieves the innocent purchaser of all inquiry, notice, and knowledge of the actual action and record of the board or council, and estops the municipality from denying that proper action was taken and that a lawful resolution or ordinance was passed."

In *Hackett v. City of Ottawa*, 99 U. S., 86, at page 95, 25 L. Ed., 363, the Court said: "The bonds in suit, by their recital of the titles of the ordinances under which they were issued, in effect, assured the purchaser that they were to be used for municipal purposes, with the previous sanction, duly given, of a majority of the legal voters of the city. * * * Such a representation by the constituted authorities of the city, under its corporate seal, would naturally avert suspicion of bad faith upon their part, and induce the purchaser to omit an examination of the ordinances themselves. * * * It would be the grossest injustice, and in conflict with all the past utterances of this Court, to permit the city, having power under some circumstances to issue negotiable securities, to escape liability upon the ground of the falsity of its own representations, made through official agents and under its corporate seal, as to the purposes for which these bonds were issued."

In *Town of Evansville v. Dennett*, 161 U. S., 434, at page 439, 16 S. Ct., 613, 615, 40 L. Ed., 760, this question was propounded to the Supreme Court: "Does the recital in the series of bonds issued in payment of subscription to the Evansville, Henderson & Nashville Railroad Company, that they were issued 'in pursuance of an act of the legislature of the State of Indiana and ordinances of the city council of said city, passed in pursuance thereof,' put a purchaser upon inquiry as to the terms of the ordinances under which the bonds were issued?" The Supreme Court in a masterly opinion answered this question in the negative.

In *Waite v. City of Santa Cruz* 184 U. S., 302, 22 S. Ct., 327, 333, 46 L. Ed., 552, the bonds in question recited

that they were issued in pursuance of the enabling act and of the ordinances of the city. Those ordinances disclosed the fact that some of the bonds for which the bonds in suit were exchanged were not the bonds of the city, but were the bonds of a private corporation, and the Circuit Court of Appeals of the Ninth Circuit (98 F., 387) held that the innocent purchaser was charged with knowledge of the contents of these ordinances, and sustained the defense of the city. This judgment was reversed by the Supreme Court in the following language: "As there was power in the city to issue refunding bonds to be used in discharging its outstanding indebtedness of a specified kind, purchasers were entitled to rely upon the truth of the recitals in the bonds that they were of the class which the act of 1893 authorized to be refunded. They were under no duty to go further and examine the ordinances of the city to ascertain whether the recitals were false. On the contrary, purchasers could assume that the ordinances would disclose nothing in conflict with the recitals in the bonds."

In *Von Hostrup v. Madison City,* 1 Wall., 291, at page 297, 17 L. Ed., 538, the Court said: "Another objection taken is, that the proviso requiring a petition of two-thirds of the citizens, who were freeholders of the city, was not complied with. As we have seen, the bonds signed by the mayor and clerk of the city recite on the face of them that they were issued by virtue of an ordinance of the Common Council of the city, passed September 2d, 1852. This concludes the city as to any irregularities that may have existed in carrying into execution the power granted to subscribe the stock and issue the bonds, as has been repeatedly held by this Court."

In *Town of Newbern v. National Bank of Barnesville, Ohio,* 234 F., 209, 217 L. R. A., 1917B, 1019, the Circuit Court of Appeals of the Sixth Circuit, in dealing with the question as to whether the town was estopped by the recitals contained in the bonds of the town signed by the mayor

and clerk under the corporate seal, said: "The natural inference arising from the presence of these virtually admitted official signatures and seal is that the officers acted with due authority; moreover, this is the *prima facie* effect in an evidential sense; and in such cases the uniform course of decision in the Supreme Court of the United States has been to treat the signatures of the executive officers and the seal of a municipal corporation as importing authority so to execute the bonds, and this, too, where the authority of the signatory officers has not appeared in the statutes."

Continuing the Court said: "To be specific, the intending purchaser was not required to look into the ordinance which is referred to in the recitals of the bonds in order to gain protection under a good faith purchase, without actual notice of the infirmity claimed in respect to the election."

In *Board of Commissioners of Lake County v. Sutliff*, 97 F., 270, at page 276, the Circuit Court of Appeals of the Eighth Circuit said: "The certificate in these bonds that they were issued 'under and by virtue of, and in compliance with,' the act of March 24, 1877, and 'that all the provisions of said act have been fully complied with by the proper officers in the issuing of these bonds,' was necessarily a certificate that they had been issued in compliance with, and not in violation of, the constitutional as well as the statutory limitation."

To the same effect are: *Board of Commissioners of Gunnison County v. E. H. Rollins & Sons*, 173 U. S., 255, 273, 274, 19 S. Ct., 390, 43 L. Ed., 689; *Buchanan v. City of Litchfield*, 102 U. S., 278, 290, 26 L. Ed., 138; *Pana v. Bowler*, 107 U. S., 529, 539, 2 S. Ct., 704, 27 L. Ed., 424; *Oregon v. Jennings*, 119 U. S., 74, 92, 7 S. Ct., 124, 30 L. Ed., 323; *Chaffee County v. Potter*, 142 U. S., 355, 364, 12 S. Ct., 216, 35 L. Ed., 1040; *Marcy v. Oswego Twp.*, 92 U. S., 637, 641, 23 L. Ed., 748; *Humboldt Twp. v. Long*, 92 U. S., 642, 23 L. Ed., 752; *Sherman County v. Simonds*, 109 U. S., 735, 737, 3 S. Ct., 502, 27 L. d., 1093; *Dallas*

*County v. McKenzie*, 110 U. S., 686, 687, 4 S. Ct., 184, 28 L. Ed., 285; *County of Presidio v. Noel-Young Bond & Stock Co.*, 212 U. S., 58, 29 S. Ct., 237, 53 L. Ed., 402.

In *Board of Commissioners of Gunnison County v. Rollins*, 173 U. S., 255, 19 S. Ct., 390, 393, 43 L. Ed., 689, the Supreme Court said: "The question of legislative authority in a municipal corporation to issue bonds in aid of a railroad company cannot be concluded by mere recitals; but, the power existing, the municipality may be estopped by recitals to prove irregularities in the exercise of that power."

In *National Life Insurance Co. v. Huron Board of Education*, 62 F., 778 (C. C. A. 8th Cir.), the citizens and officers of the city took the necessary steps to issue school bonds and certified that they were issued for that purpose. In fact, however, the real purpose was that the money should be used in persuading the people of South Dakota to select that city as the capitol of the state, and the proceeds of the bonds were used for this purpose. The Court held that the city could not, as against *bona fide* holders, set up the defense that the bonds were for the unlawful purpose of conducting a campaign for the state capitol.

In *West Plains Township, Meade County v. Sage* (C. C. A.), 69 F., 943, 946, township bonds were issued for the unlawful purpose of paying town scrip issued to purchase a sugar factory. But the certificates in the bonds certified that they were for the purpose of refunding indebtedness. The Court held: "Against a bona fide purchaser the township is estopped to deny that these bonds were issued to refund its outstanding indebtedness."

*Board of Commissioners of Kiowa County v. Howard* (C. C. A.), 83 F., 296 was a case where a similar holding was had.

Cases cited by the Circuit Judge.

The Circuit Judge cites *Anthony v. Jasper County*, 101 U. S., 693, 697, 25 L. Ed., 1005, as holding that "recitals cover only matters of fact and are without efficacy as to

matters of law." Transcript, folios 711, 716, 718. The bonds in that case contained no recitals. The statute under which they were issued required that to be valid the bond should first be registered and certified by the auditor of the state. This was not done. The Court distinctly recognized, however, that the county would be bound by recitals indorsed upon the bond, for it said: "When the certificate is found on the bond the purchaser need not inquire whether what has been certified to is true. As against a bona fide holder the public is bound by what its authorized agents have done and stated in the prescribed form."

*Barnett v. Denison,* 145 U. S., 135, 12 S. Ct., 819, 36 L. Ed., 652, was a case where the statute required municipal bonds to specify the purpose for which they were issued. The bonds in issue failed to comply with this provision and contained no recital showing compliance.

The case of *Risley v. Howell* (C. C.), 57 F., 544, referred to in the decree of the Court (Transcript, folio 746), was reversed in (C. C. A.), 64 F., 453.

### In Conclusion

To paraphrase the language of Judge Sanborn in *City of Huron v. Second Ward Savings Bank* (C. C. A.), 86 F., 272, 274, 49 L. R. A., 534, this case "presents the old questions which have often been answered by this and other Courts: May a municipal corporation certify on the face of its bonds that it has issued them for a lawful purpose, and after the bonds have been bought by an innocent purchaser for value, in reliance upon this certificate, defeat them by the plea that the certificate was false, and that they were actually issued for an unlawful purpose? May a city defeat the innocent purchaser of its bonds by diverting their proceeds, without his knowledge, from the lawful object for which it certified that it issued them?"

The answer is given by Judge Sanborn in the following language: "The fact that a municipal corporation has di-

verted the proceeds of its negotiable securities from the lawful purpose for which they appear on their face to have been issued to an unlawful purpose is no defense to an action upon them by an innocent purchaser who had no knowledge of or part in the diversion or waste." *Board of Commissioners of Kiowa County, Kan. v. Howard* (C. C. A.), 83 F., 296.

In *Town of Aurora v. Gates* (C. C. A.), 208 F., 101, 104 L. R. A., 1915A, 910, it was held that recitals in bonds issued by authorized city officers that conditions precedent had been fulfilled estop city as against innocent purchaser from inquiring whether conditions have been performed. (There can be no question that if the recitals of the purpose had been true, the city council had the right and power to issue the notes).

See, also, *Beatrice v. Edminson* (C. C. A.), 117 F., 427; *Municipal Trust Co. v. Johnson City* (C. C. A.), 116 F., 458, 468; *Board of Com'rs of Stanly County v. Coler* (C. C. A.), 113 F., 705, 711; *Independent Sch. Dist. v. Rew* (C. C. A.), 111 F., 1, 7, 55 L. R. A., 364; *Hughes County v. Livingston* (C. C. A.), 104 F., 306, 311; *Wesson v. Mt. Vernon* (C. C. A.), 98 F., 804, 809; *Brattleboro Sav. Bank v. Board* (C. C. A.), 98 F., 524 533; *Board of Com'rs of Lake County v. Sutliff* (C. C. A.), 97 F., 270, 276; *Hayden v. Aurora,* 57 Colo., 389, 142 P., 183, 186; *City of Cripple Creek v. Adams,* 36 Colo., 320, 85 P., 184, 187; *State v. Board of Com'rs of Wichita County,* 62 Kan., 494, 64 P., 45, 47; *City of Cadillac v. Woonsocket* (C. C. A.), 58 F., 935, 940; *Ashley v. Supervisors* (C. C. A.), 60 F., 55, 67; *National Life Ins. Co. v. Board* (C. C. A.), 62 F., 778, 792; *City of Huron v. Bank* (C. C. A.), 86 F., 272, 279, 49 L. R. A., 534.

III. Were Burr & Company bound to see to the application of the proceeds of the notes to the legitimate municipal purposes of the City of Union?

This question is answered in the negative by the express provisions of Section 4554, above quoted: "* * * Without responsiblity to the person or corporation advancing money on said security, to see to the application of the funds realized thereon."

I do not understand that the defendants Burr & Company contend that they are entitled to recover from the city the amount of the proceeds of the notes which actually went into the hands of the fiscal agents of the city, as for money had and received. This matter therefore is not before the Court for decision. It occurs to me that for the benefit of litigation that may arise in other cases, an expression of my opinion of the law would not be out of place, notwithstanding the fact that what I shall say is *obiter dictum*.

If the proceeds of the notes had been devoted to some legitimate, some authorized municipal purpose which was of benefit to the city, there would be strong reason to so hold the city, in consonance with the decisions in *Luther v. Wheeler,* 73 S. C., 83, 52 S. E., 874, 4 L. R. A. (N. S.), 746, 6 Ann. Cas., 754; *Lucas v. Florence,* 103 S. C., 169, 87 S. E., 996; *Wall v. Plantation Club,* 88 S. C., 61, 70 S. E., 434; *Abbott v. Lumber Co.,* 93 S. C., 131, 76 S. E., 146; *Lyon v. Patterson,* 102 S. C., 525, 87 S. E., 306; *Vann v. Jasper County,* 122 S. C., 53, 114 S. E., 704; and *Peurifoy v. Boswell,* 162 S. C., 107 (S. C.), 160 S. E., 156.

The fact, however, is that the proceeds of the notes were used to comply with a subscription of the city to the capital stock of a foreign corporation which proved to be not only unauthorized but of no benefit to the city. See Dillon on Mun. Corp. (5th Ed.), § 961.

For these reasons I think that the judgment should be reversed.