# ERNEST S. JUDD AND OTHERS v. CITY OF ST. CLOUD.[1]

## No. 30,789.

### May 22, 1936.

[1]Reported in 272 N. W. 577.

*Junell, Driscoll, Fletcher, Dorsey & Barker, Charles B. Howard,*
and *Hugh H. Barber,* for appellants.

*Allen A. Atwood,* City Attorney, *Atwood & Quinlivan,* and *Phillips & Sherwood,* for respondent.

JULIUS J. OLSON, JUSTICE.

Suit was brought by plaintiffs as a warrant-holders' committee on behalf of some 70 individuals who are owners of $287,800 of improvement revolving fund warrants issued by defendant city. The warrants involved are past due since October 1, 1929, and interest is unpaid since October 1, 1928.

Tried to the court, the findings were that the warrants are valid obligations and wholly unpaid; also that they are not general obligations of the city but payable solely out of special assessments for the particular improvement mentioned in each such warrant. Judgment in conformity with the findings was duly entered, and plaintiffs appeal.

Defendant is operating under a home rule charter adopted in 1911. The warrants involved were issued pursuant to c. XII, § 178, of the charter entitled "Local Improvements and Special Assess-

ments." As this section is of vital importance to the decision the same will be found in the margin.[2]

---

[2]"The Commission is hereby authorized in anticipation of the levy, and collection of such assessment, whether divided into installments or not, to issue warrants on the permanent improvement revolving fund, payable at such times, and in such amounts as in the judgment of the Commission the said assessments will provide for, which warrants shall bear interest at a rate not exceeding eight per cent per annum, payable annually, on the first day of October, and may have coupons attached representing each year's interest. Such warrants shall be non-assessable and shall state upon their face for what purpose they are issued, and that they are payable out of the permanent improvement revolving fund, and shall be signed by the Mayor and countersigned by the City Clerk under the seal of the City, and be in denominations of not more than one thousand dollars each. Such warrants may be used in making payments on contracts for making the improvements for which the assessments are made, or may be sold for cash, at not less than the par value thereof, and the proceeds thereof credited to the permanent improvement revolving fund, and used for paying for the said improvement. It shall be the duty of the City Treasurer to endorse on each warrant issued as aforesaid, on presentation to him, the post office address of the owner, and in case of assignment of any such warrant, the holder thereof shall present the same to the City Treasurer for endorsement of the post office address of such assignee. The City Treasurer shall keep a proper record of the post office addresses of the holders of all warrants issued as aforesaid. It shall be the duty of the City Treasurer to pay such warrants and interest coupons as they mature and are presented for payment, out of the fund on which they are drawn and to cancel the same when paid. Any indebtedness created by the issuance of any such warrants shall not be deemed a part of the total indebtedness of the City, which the City is hereinbefore forbidden to incur to exceed 10 per cent of the total value of the taxable property in such City according to the last preceding assessment for City purposes.

"Every warrant issued as aforesaid shall contain the following proviso:

" 'The City of St. Cloud reserves the right to pay this warrant and accrued interest at any time upon giving the holder thereof thirty days notice.'

"Whenever there are funds in the permanent improvement revolving fund that may be properly applied to the payment of any such outstanding warrant, it shall be the duty of the City Treasurer to notify the holder of such warrant that there is money in the City Treasury for the payment of the same." (The remaining portion relates to mailing notices and filing proof thereof.)

594

Plaintiffs in their brief say: "There is no important disagreement as to evidentiary matters since both sides rely on the books and records of the city. While error is assigned as to a number of the trial court's findings of fact, these assignments relate largely to statement of legal conclusions which the trial court inserted" therein. In view of this situation it is necessary to recite rather fully the findings of the court.

The administrative body of defendant is composed of three members: The mayor, also known as commissioner of public affairs; the treasurer, also known as commissioner of finance; and the commissioner of streets and public improvements.

Prior to 1919 a large area within the westerly boundaries of defendant city had been and was then rapidly developing as an industrial and residential district and comprised approximately one-third of the total area of the city. The land was flat and inadequately drained and was wholly without storm or sanitary sewage facilities and without a water supply system. Because of an insistent demand on the part of owners and residents within that area, the city commissioners, by appropriate resolution, directed the city engineer to prepare plans, specifications, and an estimate of cost of the construction of a trunk line sewer to be known as the "Stone Arch Sewer," to run in a generally westerly direction to the westerly boundary of the city, a distance of about three miles. Pursuant thereto the city engineer prepared and submitted to the commission plans and specifications for such sewer, together with an estimate of costs. These plans and specifications were duly approved by the commission on June 28 of that year and designated as "Improvement No. 368." In conformity with the quoted section of the charter, the commission by resolution determined that the entire cost of the new project should be assessed against the property benefited thereby. Some time thereafter the city appropriated $9,347.66 from its general fund toward the cost of the new improvement, that having been computed as the city's prorata share thereof. Appropriate assessments for benefits were duly made and confirmed by the commission and levied against benefited property in the aggregate amount of $435,845.63. A contract for the con-

struction of the improvement was duly made, the cost thereof being $467,887.06. The contract was duly completed and the contractors paid on December 2, 1922. An additional assessment to cover the balance of the cost of the improvement, in conformity with the quoted section, was thereafter made and levied in the sum of $23,918.21.

Also, in 1919 the commission determined to lay a water main in the same trench as the trunk line sewer hereinbefore referred to as improvement No. 368. This was duly designated "Improvement No. 369." The cost of that project was $70,668.84. Pursuant to resolution, an assessment of one dollar per front foot was levied against adjacent property amounting to $19,726.82. There was appropriated out of the waterworks fund of the city $49,123.88, that sum being determined as an appropriate and proper contribution to the cost of that particular improvement.

During that year the commission also determined to lay a trunk line sewer extending in a southerly direction and at right angles to the sewer referred to in improvement No. 368. This was designated "Improvement No. 370." That work was completed in July, 1921, and the final payment upon the contract for its construction was made July 17, 1922. An assessment in the amount of $55,610.33 was levied against benefited property. As the city's portion of this particular improvement $10,070 was appropriated from the general funds of the city. The total cost of this project was $66,099.40.

To finance these respective improvements the commission, by appropriate resolutions, issued warrants in anticipation of the collection of the assessments levied on account thereof. As to each improvement the warrants so issued did not exceed in amount the uncollected assessments theretofore levied.

The money market became more stringent in 1920 than it had been in 1919. To facilitate the raising of funds and in conformity with the quoted section, the commission by resolution authorized the issuance of $52,000 and $250,000 in warrants bearing interest at eight per cent per annum, payable semiannually, expressly reserving to the city, however, the right to call and pay the same upon 30 days' notice "out of warrants to be hereafter issued, and

without awaiting the collection of said assessments through the ordinary channels." The warrants issued under this resolution were to mature October 19, 1921. As time went on interest rates became less oppressive; hence we find that warrants were later issued to take up these eight per cent warrants. Resolutions were passed from time to time calling for payment the outstanding high rate warrants, and new ones were issued in lieu thereof, either to the holder of the old warrants or to anyone else who might desire such investment, the lower rate warrants ranging from seven to five per cent as the money market permitted. Substantially the same procedure was followed respecting improvements Nos. 369 and 370.

Finding X of the trial court is highly important, and we quote the same in full:

"That all warrants were by their terms, as required by said Charter, callable on thirty days' notice. Upon the adoption of a resolution for the issuing of refundment warrants to replace outstanding warrants with lower interest bearing warrants, the City clerk wrote to the various warrant holders, directing them to bring in their warrants for payment. The letter stated that warrants at the new interest rate might be had in exchange for the called warrants, if desired. Pursuant to these letters, the called warrants were mailed in to the City clerk or delivered to him in person, whereupon the refundment was handled substantially as follows, in accordance with the established practice of the City. If the holder of a called warrant desired payment thereof, a check was issued to him, drawn on the City's bank account, said check being in the principal amount of the warrant with interest. A new warrant would then be issued to some other person. Frequently replacement warrants would not be issued until a number of warrants were taken up, and would then be issued in a block. If the warrant holder desired to accept a refundment warrant in lieu of the called warrant, he was given a check for the interest on the called warrant to the date when he delivered such warrant and a receipt for the warrant itself. A separate check was then drawn, payable to the warrant holder, for the principal amount of the called warrant.

This check, however, was not delivered to the warrant holder. The City treasurer stamped an endorsement thereon, 'Pay to the order of City of St. Cloud, per assignment on file...................... City Treas.,' and signed his name in the blank space. The check thus endorsed would be delivered to the bank on which it was drawn and be credited and debited on its books. The City's cash was neither increased nor decreased, and no moneys were received or disbursed in the transaction. The check was recorded in the 'Warrant Register' (check register) and shown therein as issued in payment of the called warrant, was debited and credited to the City treasurer's cash account and debited and credited to the permanent improvement revolving⋅ fund for the proper improvement account. The check was also recorded in the 'Register of Receipts' as cash received for the warrant issued in lieu of the called warrant. In the 'Register of Permanent Improvement Revolving Fund warrants, City of St. Cloud,' the called warrant was shown as paid and the new warrant as issued for cash, but no cash, except as to the interest paid on the called warrants, was disbursed or received on account of the transaction, and all book records of cash received or disbursed were mere bookkeeping liberties. In this manner refundments of matured warrants and the replacement of outstanding warrants by lower interest bearing warrants was effected, as authorized by the various resolutions hereinbefore referred to."

The court further found that after these respective assessments had been made and levied and warrants issued there was a financial breakdown, and the economic conditions became such that benefited property owners were not meeting their maturing instalments for benefits assessed. As a consequence the major portion of the assessments levied by virtue of the improvements mentioned "remain unpaid and delinquent."

The defendant has at all times maintained an accurate individual record or account of these respective improvements, as well as all other such special improvements, wherein were entered and recorded receipts and disbursements and appropriate charges and credits entered as and when moneys were collected and expended. The court found, and the evidence sustains the finding, that the

city has disbursed, since these improvements were made, the following sums paid by the city out of its general funds, namely, improvement No. 368, $23,143.37; No. 369, $2,164.19; No. 370, $3,976.91, such contributions having been made and paid in excess of the receipts for and on account of said respective improvements. These contributions have been and are being carried in the form of overdrafts against said improvements. The court further found that in addition to the large sums hereinbefore mentioned the city, between October 11, 1928, and February 28, 1929, "issued warrants purporting to be on account of said improvement [No. 368] in the aggregate sum of $16,500, and used the proceeds thereof to pay said interest" upon outstanding warrants; "that thereafter, during the year 1930, the warrants so issued, together with the interest thereon, amounting in all to $18,109.03, were paid by moneys advanced from the general fund" of the city. "That at no time since the warrants held and owned by the plaintiffs became due has the defendant City had, or does it now have, any money belonging to said improvements Nos. 368, 369 or 370, or any of them, but at all times the funds of said improvements have been overdrawn as aforesaid."

Findings XVI and XVII are deemed important enough to be quoted in full and read as follows:

"XVI. That the defendant City did not at the time of the sale of any of the warrants herein involved, through any of its officers, employees or agents, make any statements or representations as to the nature and extent of the liability of the City under said warrants, and did not state or represent in substance or effect that said warrants were general obligations of the City, that the City was back of said warrants, that the taxable property of the City was back of said warrants or that such property could be taxed for their payment.

"XVII. That after October 1, 1929, when the warrants involved herein became due, the City continued to pay warrants issued on account of improvements other than Improvements Nos. 368, 369 and 370, and since said date and prior to December 31, 1933, has paid a total of $365,775.00, principal amount of warrants issued on account of such other improvements, but none of the moneys used

for the payment thereof were moneys arising from any assessments levied on account of Improvements Nos. 368, 369 or 370, or moneys appropriated from the funds of the City for the use of said improvements, or moneys in any way belonging to said Improvements Nos. 368, 369 and 370."

The court found that plaintiffs are the owners of warrants issued against (1) improvement No. 368 in the principal sum of $261,300, and interest coupons attached amounting to $14,561; (2) improvement No. 369, plaintiffs hold $9,000 principal with attached unpaid interest coupons in the sum of $530; and (3) as to improvement No. 370, plaintiffs hold $27,500 principal with past due interest coupons amounting to $1,650.

In addition to receipts from instalments paid by property owners upon their assessments for benefits and other items duly credited upon defendant's books respecting improvement No. 368, the court also found that it had received $3,041.55 interest upon instalments of assessments collected by the county and erroneously credited by the city to its general fund; also, that said fund should be credited with $3,158.19, interest received by the city from depository banks on cash balances. Respecting improvement No. 369, the court found that a similar interest item in the amount of $117.08 should be credited to that improvement. Concerning improvement No. 370, the interest amounted to $1,430.94, and here, too, the court directed a similar credit.

It is important to note, however, and the court so found, that as to all of these accounts the city had in fact paid out of its general fund and into these special funds much more than these credits, hence that there had been in fact no impairment to the detriment of warrant holders.

The court concluded that these warrants "are not general obligations of the defendant City and are not payable from the general fund of said City or from any fund raised or to be raised by a general tax upon the taxable property of the said City." Judgment was thereupon duly entered in conformity with the findings.

■ There can be no doubt that the involved warrants were issued by the city for special improvements for which benefited property

was assessed. It seems equally clear that the authority for issuing such is the quoted section of the charter.

Plaintiffs maintain that these warrants, in view of the facts recited, are general obligations of the city and as such must be met by it; that the special assessments for benefits are designed and intended as the means whereby the city may reimburse its general taxpayers for the costs thus incurred. Many cases are cited bearing upon this phase. Perhaps the leading case in this state is that of Van Pelt v. Bertilrud, 117 Minn. 50, 51-52, 134 N. W. 226. There the issue was whether drainage bonds issued by the county to raise funds for the construction of public drainage ditches was a direct obligation of the county. This court held that they were. The basis for the conclusion reached was expressed thus:

"The theory upon which drainage legislation rests is public utility and welfare. The interests of individuals are incidental, and can never alone justify either changing or affecting property against the owner's consent, as may be done in establishing drains. It is to subserve a public purpose, and not private ends, that the law was enacted. With this in mind, it is not difficult to come to the conclusion that the legislature intended that the county should be primarily and directly liable for the expense of establishing, constructing, and maintaining this public utility. And if the expense is paid by the county by the issue and sale of bonds, then the county should pledge its credit for the payment of such bonds."

Defendant cites and relies upon Leslie v. City of White Bear Lake, 186 Minn. 543, 243 N. W. 786. In that case 1 Mason Minn. St. 1927, § 1893, was carefully considered and interpreted by this court. The original act is found in L. 1903, c. 312, and as amended is now 1 Mason Minn St. 1927, §§ 1880 to 1906. A reading of that act when laid side by side with the city charter upon which defendant relies makes it quite clear that the language of the charter is in substance and effect the same as the general law interpreted in that case. Unless we are to overrule that decision, it is clear that plaintiffs' cause must fail insofar as plaintiffs' claim of defendant's general liability is concerned.

We think the applicable rule of law is well stated in 5 McQuillin, Municipal Corporations (2 ed.) § 2097, p. 428, wherein the author states:

"Unless restricted it is competent for a municipal corporation to provide for paying the cost of·a public improvement out of a special fund. Usually warrants issued for an improvement, payable out of a special fund, cannot be collected against the municipality generally although the remedy to collect from the special fund should be lost."

And the same author, § 2337, p. 972, says:

"When a municipal corporation by authority of law creates a particular fund with reference to which it contracts, any indebtedness arising on such contract is payable therefrom only."

To the same effect is Hainer, Modern Law of Municipal Securities, § 361, wherein the author states:

"When warrants or orders are drawn payable out of a particular fund, they create no general liability against the municipality upon which an action may be maintained by the holder. A municipality in such cases is only liable for the proper administration of the fund, and when that is exhausted its liability to the holder ceases."

Likewise, we think the law is well established that one who purchases a municipal warrant is charged with notice of the law under and by virtue of which such obligation is issued. See 6 McQuillin, Municipal Corporations (2 ed.) § 2410, pp. 87, 88, where it is said:

"A holder of municipal warrants is chargeable with notice of all the restrictions in the law, e. g., debt limit provisions. He takes them subject to the mode of payment prescribed, and all the defenses available against the person to whom issued. * * * A person taking a warrant is bound to know the law relating thereto. He is not a favored creditor. If not the original payee, it is immaterial that he is a bona fide purchaser for value."

To the same effect are many cases. A few citations will suffice. In Pratt v. City of Seattle, 111 Wash. 104, 189 P. 565, the sixth syllabus paragraph (189 P. 565) reads:

"Where local improvements were made under an ordinance specifically providing for payment by special assessments on property benefited, the city is not legally liable to pay the cost of such improvement from its general funds, though the special assessment produces funds insufficient to pay the cost."

In Bankers T. & S. Bank v. Village of Anamoose, 51 N. D. 596, 200 N. W. 103, the court had for consideration a case very similar to the issue here presented. There the attempt was made to hold the village generally liable for warrants similar in form and substance to those involved here. The opinion quotes the section of the statute pleaded and relied upon by that defendant. In view of the similarity of the language employed in the North Dakota statute as compared with our own statute, L. 1903, c. 312, and the quoted section of defendant's charter, we quote (51 N. D. 600):

"Such warrants shall state upon their face for what purpose they are issued, and the fund from which they are payable. * * * Such warrants may be used in making payments on contracts for making such improvements or may be sold for cash at not less than the par value thereof, and the proceeds thereof credited to such fund, and used for paying such improvements. It shall be the duty of the city treasurer to pay such warrants and interest coupons as they mature and are presented for payment out of the district funds on which they are drawn, and to cancel the same when paid."

The decision reached was that plaintiff could not recover upon the theory of defendant's general liability. There, as here, failure on the part of owners of property benefited to pay their assessments caused the loss.

Plaintiffs have caused to be appended to their brief a copy of the form of warrant used. We deem it important that the same be quoted in full:

"UNITED STATES OF AMERICA
CITY OF ST. CLOUD, STATE OF MINNESOTA
DEPARTMENT OF FINANCE AND ACCOUNTS No. 3876.
WARRANT ON PERMANENT IMPROVEMENT REVOLVING
FUND

"WHEREAS, the City of St. Cloud has made and confirmed a special assessment upon the property benefited thereby for the purpose of Construction of a Trunk Line Sewer in Sewer District #8, which has been duly designated as Improvement Number 368 and

"WHEREAS, said assessment is in due course of collection, but not yet collected and

"WHEREAS, at a regular meeting of the Commission of said city held on the twenty-third day of June A. D., 1925 a resolution was duly adopted authorizing the issuance of warrants on the Perma-nent Improvement Revolving Fund of said City in denominations of five hundred Dollars ($500.00) each in anticipation of the levy and collection of said assessment as provided by Section 178 of the. Charter of said city.

"Now THEREFORE, and pursuant to said resolution, the Treasurer of the City of St. Cloud will pay on October 1st, A. D. 1929 to the order of Mrs. Anna Simmers, of St. Cloud, State of Minnesota the sum of Five hundred and no/100 Dollars ($500.00) out of the Per-manent Improvement Revolving Fund of said city, account Improve-ment No. 368, together with interest thereon at the rate of five per cent, per annum, payable annually in accordance with interest coupons hereto attached, subject however to the following reserva-tion, to-wit:

"The City of St. Cloud reserves the right to pay this warrant and accrued interest at any time upon giving the holder thereof thirty days notice, as provided by section 178 of this charter.

"Dated at St. Cloud, Minnesota and issued this sixteenth day of May, A. D. 1927.

"J. Donald McKenzie          J. Arthur Bensen
         "City Clerk                    Mayor"

It is to be noted that the particular improvement is adequately designated in the warrant itself. The claimed authority on the part of defendant to issue the warrant by virtue of a definite resolution is therein set forth. The promise on the part of defendant is to pay *"out of the Permanent Improvement Revolving Fund of said city,* account *Improvement No. 368."* This language is free from doubt. The charter limitations as contained in the quoted section (178) that the funds received for such warrants are to be "used for paying for the said improvement" is significant. Also of equal significance is the duty imposed upon the treasurer "to pay such warrants and interest coupons as they mature and are presented for payment, *out of the fund on which they are drawn."*

There are many cases in the books bearing upon this particular phase. The following we think are instructive: Board of Commrs. of Tippecanoe County v. Cox, 6 Ind. 403; Porter v. City of Tipton, 141 Ind. 347, 40 N. E. 802; Thayer v. City of Grand Rapids, 82 Mich. 298, 46 N. W. 228; Campbell v. Polk County, 49 Mo. 214; Commissioners v. Call, 123 N. C. 308, 31 S. E. 481, 44 L. R. A. 252; Suttor v. Town of Wetonka, 62 S. D. 339, 253 N. W. 64; Findley v. Hull, 13 Wash. 236, 43 P. 28; Stephens v. City of Spokane, 14 Wash. 298, 44 P. 541, 45 P. 31; German-Am. Sav. Bank v. City of Spokane, 17 Wash. 315, 49 P. 542, 38 L. R. A. 259; Wilson v. City of Aberdeen, 19 Wash. 89, 52 P. 524; North Western Lbr. Co. v. City of Aberdeen, 22 Wash. 404, 60 P. 1115; Dickerson v. City of Spokane, 35 Wash. 414, 77 P. 730; State ex rel. Nat. Bank of Tacoma v. City of Tacoma, 97 Wash. 190, 166 P. 66; Uncas Nat. Bank v. City of Superior, 115 Wis. 340, 91 N. W. 1004; Aetna L. Ins. Co. v. Lyon County (C. C.) 44 F. 329; Peake v. City of New Orleans, 139 U. S. 342, 11 S. Ct. 541, 35 L. ed. 131; Moore v. City of Nampa, 276 U. S. 536, 48 S. Ct. 340, 72 L. ed. 688.

While not directly in point, yet of value here, in addition to the case of Leslie v. City of White Bear Lake, 186 Minn. 543, 243 N. W. 786, heretofore cited, are Lovell v. City of St. Paul, 10 Minn. 229 (290); Foster v. Malberg, 119 Minn. 168, 137 N. W. 816, 41 L.R.A. (N.S.) 967, Ann. Cas. 1914A, 1116. The second syllabus paragraph appearing in 119 Minn. 169, reads:

"Although the requirement of R. L. 1905, § 927, that a certain notice must be given by a county auditor before he sells lands for taxes, is mandatory, and calls for a purely ministerial act on the part of the auditor, the nonperformance of which renders a sale by him void, yet under the doctrine of caveat emptor, as applied to tax sales, the purchaser at such a sale is conclusively presumed to know of the existence of every defect in such proceedings; and hence, if, by reason of the auditor's failure to give the prescribed notice, the purchaser fails to obtain a valid title, it must be considered that the latter's own want of proper care and diligence, and not the neglect or default of the auditor, was the proximate cause of the purchaser's injury, so that the latter can have no recovery against the former therefor, in the absence of statute to such effect."

We think it is clear that the language of the quoted charter provision determines the extent of defendant's liability, plaintiffs' claim to the contrary notwithstanding.

■ Plaintiffs' next claim is that there is liability on the part of the city as for breach of trust in that its officers (1) failed to levy assessments in an amount equal to the cost of each improvement; (2) wrongfully permitted certain property owners to make belated elections to pay assessments in instalments instead of in a lump sum; (3) failed to stop issuance of warrants after the projects were completed and the contractor paid; (4) failed to retire warrants promptly as assessments were paid; (5) without authority charged the cost of the Stone Arch Sewer outlet to project No. 368; (6) failed to levy additional assessments to make up deficit due to nonpayment of assessments; and (7) that there was misuse of proceeds of collections received upon the special assessments levied.

These contentions are not sustained by the findings of fact. (1) It will be noted that the total assessment levied as to improvement No. 368, including the city's appropriation thereto, is $469,-111.50. The cost of the project was $467,887.06. In respect of improvements Nos. 369 and 370, it is conceded that as to the former there was an insufficiency in the levy of $1,818.14, and as to No. 370, $440.07. Assuming that there was failure of performance of duty in respect of these two items, that does not convert plaintiffs' war-

rants into general obligations. At most, plaintiffs can only ask for compliance with the quoted section of the charter or perhaps hold the city liable for these respective deficiencies. But, as we have already observed, the city had already paid out of its general fund something over $6,000 in excess of receipts as to these two improvements. The funds so contributed have gone to all holders of warrants in the way of interest payments and other proper charges. We are unable to see wherein plaintiffs can find any comfort in this situation. No one has been hurt or prejudiced.

(2) Under § 172 of the city charter it is provided that the commission may, upon appropriate application in that behalf, permit an election to pay assessments in instalments at any time prior to certification. There is no proof in the record that such permission was not given. We think the presumption of regularity on the part of public officers must necessarily prevail until there is some credible evidence to show failure in that regard. Nor is there any suggestion in the record that any warrant holder was prejudiced thereby. The most that can be said for plaintiffs' position is that it gives them a basis for argument rather than right of recovery. Many of these warrants were issued long after the so-called belated elections had been made. Everything was a matter of public record. The same reasoning applies equally in respect to certain assessments levied against acreage tracts which later were divided into individual lots after platting. This was done by the city pursuant to L. 1923, c. 40 (1 Mason Minn. St. 1927, §§ 1713-1, 1713-2, 1713-3). That chapter permits the prorating of assessments against the smaller tracts after the subdivision has been made.

(3) With regard to failure to stop issuance of warrants after the projects were completed, it seems clear that the city, having plenary authority to issue warrants in the first instance to the extent of properly levied and uncollected assessments, also possessed authority to issue later warrants in exchange for the older, especially where, as here, it was to the advantage of the property owner so assessed to have reduction in interest rates when and as the money market permitted. In no instance was any warrant issued to mature beyond the final due date of the levied assessments, nor

in excess of the unpaid instalments against which issued. No harm to plaintiffs can be traced to this arrangement. Furthermore, all these proceedings were a matter of public record. Any purchaser of a warrant was by its very terms put on notice, not only as to the improvement itself, but also as to the plan and purpose of the particular issue as authorized by the resolution referred to therein. This is obvious from a mere glance at the form of warrant here in use.

(4) Plaintiffs' claim that defendant city failed to retire warrants promptly as assessments were paid requires very little comment. No complaint is made with respect to improvements Nos. 369 and 370. It is true that during the years 1923 and until about May, 1925, there were substantial cash balances carried in the account of improvement No. 368. But to be remembered is the fact that during this time there was an annual interest charge on warrants amounting to approximately $25,000. The city was engaged in refunding maturing warrants in order to bring about a reduction in the interest rate. The court in its findings determined that what the city did was within the sound discretion of the city officials. We do not believe that this finding can be successfully challenged.

(5) The outlet of sewer improvement No. 368 was contemplated to be the same as the former outlet of another sewer system. The outlet is the Mississippi River. When improvement No. 368 was in course of construction it was found necessary to submerge the former outlet. The record is such as to make it very difficult of ascertainment as to the actual cost of this extra job. The work was done under "force account." The total amount of money expended respecting this force account was approximately five per cent of the total cost of improvement No. 368. The share of the cost chargeable to the improvement was included in the assessments. There is no record that any property owner protested the inclusion of this item. It does not seem to us, in view of the fact that many of the warrants involved in the instant case were issued long after the completion of the work, that any just complaint can be lodged

against the city officials respecting the manner in which this work and financing was done.

(6) Plaintiffs also complain that the city officials were negligent in failing to impose additional assessments to make up the deficiencies due to failure of collecting assessments levied. As we have already observed, the total assessments, including contributions by the city as such out of its general fund, exceed the total cost of all these projects. Under these circumstances, can it be said that plaintiffs have a right to have properties that have already paid the full amount assessed again charged with an additional assessment to make up for the failure of others to pay? Obviously the benefits form the basis for the assessment in the first place. As far as it is reasonably practicable, property so benefited must bear its just portion of the burden. In Noonan v. City of Stillwater, 33 Minn. 198, 202, 22 N. W. 444, 446, 53 Am. R. 23, the court said:

"It is not to be supposed that in adopting this amendment the people intended to reject or modify, in respect to taxes of this class [special assessments], so just and reasonable a principle as that they 'shall be as nearly equal as may be,'—a principle without which the attempt to tax might become practically confiscation."

And in State ex rel. Oliver I. Min. Co. v. City of Ely, 129 Minn. 40, 151 N. W. 545, Ann. Cas. 1916B, 189, it was held that benefited property cannot be arbitrarily assessed. The assessment must be uniform as it affects all property liable for the particular improvement. Cases from other jurisdictions sustain this view. See School Dist. No. 1 v. City of Helena, 87 Mont. 300, 287 P. 164; Oregon Short Line R. Co. v. Berg, 52 Idaho, 499, 16 P. (2d) 373; Interstate Trust Co. v. Montezuma Valley Irr. Dist. 66 Colo. 219, 181 P. 123; State ex rel. Larson v. City of Vancouver, 160 Wash. 655, 295 P. 947.

Complaint is also made respecting failure of the city to levy an assessment against the Great Northern Railway Company for supposed benefits by that company received from the construction of these improvements. The trouble is that under G. S. 1913, § 2226, the property of railroad companies paying gross earnings tax was exempt from local assessments if the railroad property was used

for railroad purposes. See State ex rel. Minnesota Transfer Ry. Co. v. District Court, 68 Minn. 242, 71 N. W. 27; Patterson v. C. R. I. & P. Ry. Co. 99 Minn. 454, 109 N. W. 993. That exemption continued until December 1, 1920, when the constitution was amended as authorized by L. 1919, c. 533. The assessment involved in improvement No. 368 was levied in 1919. It is therefore clear that at that time the assessment could not be levied. Whether any opening remains respecting the imposition of a tax against the railway company, or may now exist, we, of course, are not here called upon to decide.

(7) Plaintiffs strenuously urge that the city did not call the warrants in for payment when and as money was available with which to meet the same. The trouble with plaintiffs' position is that approximately $132,000 was applied directly in payment of the costs of the project. As to the money thus paid and applied, there are of course no warrants outstanding. With regard to the claim that something over $100,000 of assessments were collected between 1921 and 1925, it must not be overlooked that interest upon these warrants was being met and paid considerably in excess of this sum. All warrant holders, including the present plaintiffs or their assignors, participated prorata in these interest payments. The city paid all interest upon all warrants outstanding up to October 1, 1928. The court has so found, and the record leaves no doubt that this is so.

Plaintiffs' assertion that the city should be held liable generally as for money had and received cannot be sustained. Obviously, here there is no unjust enrichment. As we have already said, the findings negate any wrongful or improper act on the part of the city officials. The whole thing simmers down to this: Were it not for the fact that assessed property has failed to meet the instalments loss would not have occurred. Who is to bear that loss?

Of course losses, financial or otherwise, are always to be regretted. But the conclusion seems inescapable that these plaintiffs, and other warrant holders also, purchased these investments with their eyes open. They stepped into the shoes of a lienor. The

property upon which the lien exists is there to respond to appropriate suit for contribution and distribution. That, however, is not the present case. We cannot charge the general taxpayers of defendant city with the deficit and consequent loss plaintiffs may have to suffer. Were we to do so we would be simply placing a burden upon the general taxpayers whose interest in these improvements is remote rather than special and personal.

■ Lastly, plaintiffs urge that the court erred in awarding costs to the defendant. In a very lucid memorandum the court states its reasons for that conclusion as follows:

"In the complaint plaintiffs set up several claims upon which they seek to hold the defendant city of St. Cloud generally liable and the complaint can only be construed as seeking a money judgment against the city. * * * plaintiffs did not make the city officials parties to the action. * * * The city has at all times admitted the legality of the warrants and that the warrants are due. But the city claimed that these warrants are not general obligations of the city. The issue therefore as framed by the pleadings and litigated was whether or not the city has become generally liable so that plaintiffs would be entitled to a money judgment against the city. On these issues the defendant prevailed."

2 Mason Minn. St. 1927, § 9473, provides that costs and disbursements go to the party ultimately prevailing in the action. 2 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934) § 2206, states:

"No general rule can be laid down as to who is the prevailing party."

We think in view of the facts here appearing that the court was well within its rights in awarding costs to defendant. See Culligan v. Cosmopolitan Co. 126 Minn. 218, 148 N. W. 273; Walsh v. Kuechenmeister, 196 Minn. 483, 492, 265 N. W. 340, 344.

The judgment is affirmed.

Mr. Justice Stone took no part in the consideration or decision of this case.

AFTER REARGUMENT.

On April 16, 1937, the following opinion was filed:

STONE, JUSTICE.

Upon plaintiffs' petition we have had a reargument.

The bases for recovery are stated. They are as follows:

(1) "Plaintiffs are entitled to recover on the warrants, that is, in accordance with the City's expressed promise to repay the money borrowed from plaintiffs and their predecessors in interest."

(2) "If plaintiffs are not entitled to recover on their first theory, they are entitled to judgment against the defendant for its breaches of those duties which are necessarily implied from the basis on which appellants' first theory is denied."

■ Discussing these in their order plaintiffs say:

"The basic, fundamental, and never-to-be-forgotten fact in this case, the one to which all others are ancillary, is this: The defendant City borrowed $287,800 of actual money from the plaintiffs or their predecessors in interest, and promised to repay it, but has failed and refused to do so." They concede however "that sound judicial authority exists for the proposition that persons dealing with public corporations are bound to know the law under which the corporation operates and the limitations which the law imposes on the powers of the corporation and its representatives. An application of this rule is found in the statement that applicable charter and statutory provisions are deemed a part of a municipal bond, warrant, or other promise to pay money." Also that: "It is not unreasonable to expect all persons dealing with a city to know that it is a corporation and to know that corporations are created for certain purposes and have limited powers and liabilities and that those limitations will be found in its charter and applicable statutes as construed by the courts."

We concur in these views. The authorities generally so hold. Since the filing of our former opinion we now have the advantage of the recent decision in Schieber v. City of Mohall, 66 N. D. 593, 610, 268 N. W. 445, 454. Amongst other things the court there says:

"It cannot be too often reiterated that those dealing with the city in the matter of public improvements are conclusively presumed to know the extent of the power and the authority of the city council to incur obligations for the city. * * * The constitution and the legislature have seen fit to place upon · * * * the holders of the warrants the burden of assumption of risk of payment. All the holders can do is to require the city to live up to its contract and here the city has done all that it can do in the way of ascertaining the cost and providing for the payment. If there is an error, or financial and economic conditions become such that loss must fall upon some party to the contract, the loss falls upon the holders of the assessment warrants."

In that case, as here, the determinative question was whether the involved warrants were general obligations of the city or payable only out of proceeds of special assessments on benefited property. ■ It is claimed that our former opinion overrules the rule announced in Woodbridge v. Duluth City, 57 Minn. 256, 59 N. W. 296; Van Pelt v. Bertilrud, 117 Minn. 50, 134 N. W. 226; and State ex rel. Oliver I. Min. Co. v. City of Ely, 129 Minn. 40, 151 N. W. 545, Ann. Cas. 1916B, 189. The opinion does not so say. On the contrary, the liability here sought to be imposed was interpreted in the light of the language construed in Leslie v. City of White Bear Lake, 186 Minn. 543, 243 N. W. 786. In our former opinion in this case we said: "A reading of that act when laid side by side with the city charter upon which defendant relies makes it quite clear that the language of the charter is in substance and effect the same as the general law interpreted in that case."

The obligations involved are contractual. The issue is one of law. Do the facts put the instant case within the doctrine of the White Bear Lake case or are they such as to bring it within the others relied upon by plaintiffs? We said in our former opinion that "Unless we are to overrule that decision [White Bear Lake case], it is clear that plaintiffs' cause must fail" as to imposition of general liability. The reasons for the result there reached are adequately stated. However, additional reasons appear for reaching the same result.

It is well to note that the *general* obligations of the city are provided for under c. XI, §§ 132 to 147, inclusive, of the charter. The title heading of that chapter is "Bonds." The obligations therein referred to are "bonds of the city" and "indebtedness of the city." That chapter limits the purposes for which such obligations may be issued. No provision is made for the issue of bonds to defray costs of sewer mains or for the establishment of a general revolving fund to finance local improvements. "Local Improvements and Special Assessments" are governed by c. XII, §§ 148 to 198, inclusive. Section 178 has been quoted in the original opinion. It controlled the issue and limited the obligation of the warrants in suit.

By § 134, the interest upon the city's general obligations is limited to five per cent, while § 178, the one here controlling, permits interest not exceeding eight per cent. Under § 135, before a bond issue may be floated, an affirmative vote of five-eighths of the electors is required (except where the bond is a refunding bond or issued to pay a judgment). The electors have no voice and are not consulted respecting liabilities of the kind here involved. Under § 113, provision is made for the establishment and maintenance of the various funds of the city. Subdivision 15 thereof provides for a permanent improvement fund "for the purpose of paying the cost of all real property" to be acquired by the city *"and also for the purpose of paying such portions of the expenses of local improvements as shall devolve upon"* the city. By subdivision 17 there is established "A permanent improvement revolving fund for the purpose of providing moneys for paying for that portion of local improvements, under the provisions of this Charter, for which assessments may be levied, *but it shall not be supported by taxation."* (Italics supplied.) Plaintiffs refer to this as "one of the 'apparent ambiguities' which accounts for the case being here." By § 123 the treasurer is required to keep a "complete, accurate and separate account" of each of the separate funds embraced in subdivisions 1 to 17 under § 113. In this account he must show the source and amount of all receipts and the amount, purpose, and name of payee as to all sums disbursed for each local improvement for which an

assessment is made. When warrants are sold upon this fund the proceeds must be "used for paying for the said improvement." During the more than a quarter of a century since the charter was adopted, the city has kept a separate account for each improvement so that anyone desiring the information would know exactly what the status of any improvement account was.

Furthermore, the charter provides for a sinking fund for bonds but none for permanent improvement revolving fund warrants. By § 124 the city is authorized to issue and sell tax anticipation certificates, under which such obligations are secured by the "faith and credit" of the city. It is significant that no such authority exists respecting warrants of the type here involved. Under § 150, the commission, when establishing an improvement to be paid by special assessments, may determine what portion of the cost the city as such is to share. Section 185 provides that in the event the first assessment to pay for a local improvement "shall prove insufficient to fully pay for the same, * * * the Commission may assess and re-assess the same upon the property benefited until a sufficient amount is realized to pay the same. *If too large an amount shall at any time be raised the excess shall be refunded ratably to those by whom it was paid, if the Commission shall so order, it being the true intent and meaning of this act to assess and re-assess the property benefited to the extent of such benefits for any deficiency over and above the first assessment which said improvement may cost,* whether the said improvement has heretofore been made or may hereafter be made. And no error or omission or irregularity, whether jurisdictional or otherwise, shall prevent a re-assessment to the extent of the benefits conferred by such improvement." (Italics supplied.) But by § 156 it is specifically provided that "No assessment shall exceed the actual benefit to the tract or parcel of property upon which the same shall be assessed."

The resolutions recite in great detail the nature of the improvement for which warrants are to be issued, location thereof, and the number of the improvement itself. There can be no room for reasonable doubt that anyone desiring to investigate the facts had ample notice of where the same could be found.

■ Plaintiffs reiterate that "St. Cloud borrowed $287,800 from appellants or their predecessors in interest which it agreed [generally] to repay on October 1, 1929," but their claim is unsupported by either facts or law. If their suit were upon a loan of money, as the word "loan" is used in a commercial sense, the situation would be wholly different. Plaintiffs cannot prove an outright loan for the simple reason that the city officers with whom they dealt had no authority to obligate the city in that fashion. It is plain that the warrant holders could acquire no more than such officers were by law authorized to sell or grant. The latter were not authorized to "borrow" the money outright. Even if so disposed, those officers could not transgress their charter authority. (There is no issue of apparent as distinguished from actual authority.) Furthermore, the court found that neither the city nor its officers had made "any statements or representations as to the nature and extent of the liability of the City under said warrants, and did not state or represent in substance or effect that said warrants were general obligations" or that the city "was back of said warrants."

The city's obligations under these warrants were not, and, under its charter, could not be, its general obligation. The wishes and requirements of the public, the general taxpayers of the city, were not consulted respecting these improvements or the means or manner of meeting their payment. If plaintiffs' contentions were to be sustained, the general taxpayers would be "saddled with the cost of improvements in the making of which they had no voice," (66 N. D. 609, 268 N. W. 454) and for which *specially benefited property* was assessed in adequate amount to meet them. Plaintiffs as matter of fact "contracted for a lien and payment out of a particular fund, and cannot claim a general liability unless the city wrongfully diverts this fund." Vallelly v. Board of Park Commissioners, 16 N. D. 25, 29, 111 N. W. 615, 616, 15 L.R.A.(N.S.) 61.

"The transaction was purely contractual and the city, having done all that it contracted to do without fault or neglect on its part, cannot now be held liable." Bankers Trust & Savings Bank v. Village of Anamoose, 51 N. D. 596, 601, 200 N. W. 103, 105. "Even *bona fide* purchasers for value are chargeable with notice of

the contents of an ordinance referred to in the recitals of a municipal obligation as the authority under which such obligation is issued." Bolton v. Wharton, 163 S. C. 242, 161 S. E. 454, 86 A. L. R. 1101, 1103. "Bonds issued without authority are void even in the hands of bona fide purchasers. Purchasers of municipal bonds are chargeable with notice of the authority of the municipal officers issuing them." 4 Dunnell, Minn. Dig. (2 ed. & Supp. 1932) § 6736, and cases cited under note 42. And the same is true where bonds are "issued in excess of the limit prescribed by statute." They are void "even as to a bona fide holder." Id., § 6734. In Town of Plainview v. W. & St. P. R. Co. 36 Minn. 505, 512, 32 N. W. 745, 746, the court held that certain recitals in the bonds were sufficient to put the purchasers upon inquiry respecting the authority under which they were issued, "and the manner in which they were in fact issued." The recitals in these bonds are found at p. 508, 36 Minn. A reading thereof establishes that what is stated on the face of the involved warrants is even more patent as notice than the language referred to in the cited case.

■ Nor are we favorably impressed by plaintiffs' claim that they may resort generally to the revolving fund for recoupment. In view of the established fact that there is nothing therein from the benefited property assessed and to which these warrants relate, it is clear that anything taken therefrom must come out of assessments made against other improvements. Such procedure would inevitably result in robbing Peter to pay Paul.

Plaintiffs have asserted with much vigor that as to them defendant occupies the position of a trustee. If that be so, where is the justification for taking property from one beneficiary to whom it belongs and giving it to another whose interest in the fund has been exhausted? Any trustee so acting would be guilty of plain breach of trust and liable to the one suffering injury therefrom.

■ The foundation for authority to levy special assessments is the benefit which the object of the assessments confers upon the owner of the benefited property. The theory is that the owner does not in fact pay anything in excess of what he received by reason of the improvement. Hence, when special assessment warrants are

issued, as here, payable out of a special fund, the municipality only pledges its good faith to make the necessary assessments and attempt collection thereof, to the end that the funds collected may be used in payment of warrants so issued. If it complies with these requirements, any deficiency, absent negligence, must be borne by the warrant holder. Schieber v. City of Mohall, 66 N. D. 593, 268 N. W. 445, and see cases cited pp. 606, 607. And in State ex rel. Oliver I. Min. Co. v. City of Ely, 129 Minn. 40, 45, 151 N. W. [2] 547, Ann. Cas. 1916B, 189, this court said:

"Special assessments for local improvements rest upon the theory that the property so assessed is specially benefited by the improvement, and a special assessment which exceeds the amount of such special benefit is, as to such excess, a taking of private property for public use without just compensation." (Citing authorities.)

The warrants held by plaintiffs were clearly intended to be in renewal or in lieu of the original warrants. There was but a mere substitution of one creditor for another. The applicable resolutions and records of the city clearly so state. The authority so to issue the warrants cannot be enlarged by plaintiffs, as they were charged with notice of charter limitations, under which they could acquire no greater rights than the city officers were authorized to grant. The court in the Schieber case [66 N. D. 614, 268 N. W. 456] recognizes that this is a matter lying wholly within legislative authority.

"To substitute new improvement warrants and thus give the property owners who have not paid additional time to pay the indebtedness is a matter wholly within the power of the legislature to determine and of the city to act. Authorization of this procedure does not thus subject the property holder who has already paid his full assessment to additional payments, nor does it determine whether his property has in fact paid the full amount of the benefit received."

Cases bearing upon the subject of rights of creditors of a public body to full or prorata payment when the fund out of which an obligation is payable is insufficient to pay all like obligations

of equal dignity are annotated in 90 A. L. R. 717, *et seq.* That question is not before us now, and we of course express no opinion regarding same.

We adhere to the result reached in our former opinion.

MR. CHIEF JUSTICE GALLAGHER took no part in the consideration or decision of this case.